# THE B. F. STURTEVANT CO. *vs.* CUMBERLAND DUGAN & COMPANY.

*When Factor Not Bound to Insure Goods in His Possession—Contract Cannot be Altered by Act of one Party Alone—Notice to Insure Printed on Invoice Sent to Agent with Goods—Goods Held Under Agreement of Bailment and Not of Sale—Action by Principal to Recover from Agent for Failure to Insure Goods.*

It is not the duty of a factor to insure the goods of his principal unless instructed so to do, or unless the obligation to insure is imposed by the usage of the trade or the agreement of the parties.

When there is an express contract between principal and agent as to the terms upon which goods are consigned to the latter for sale, that contract cannot be modified by words used by the principal in an invoice accompanying a shipment, to which the agent does not assent.

When the express contract between the parties does not require the agent to insure the goods entrusted to him, such obligation is not imposed by the mere fact that upon the invoice sent with the goods consigned, there is printed the words, "stock to be kept covered by insurance for the benefit of the consignor," and that the agent retained the goods without objecting to this notice.

When the contract between a consignor of goods and his agent to sell provides that the agent shall not sell for less than the invoice price, but shall be entitled to whatever excess over that price he may obtain, and the agent is under no obligation to pay for the goods until he sells them, the transaction is a bailment and not a sale. The goods until sold remain the property of the consignor and in the event of a loss, *res perit domino.*

Goods were consigned by the plaintiff company to the defendants to be sold by the latter under an agreement which provided that the defendants were to pay the freight charges and to be allowed a discount of twenty-five per cent from the list or invoice price of the goods; that if the defendants sold the goods for more than the invoice price, they were entitled to the excess, and that the defendants were to account to the plaintiff for price of goods sold, but were under no obligation to pay for goods consigned until sold. In this contract no reference was made to insurance on the goods and no special instruction was given to the defendants to effect insurance. The plaintiff's evidence was that the goods or some of them when shipped to the defendants were accompanied by invoices on which was printed in small type at the bottom, "goods to be kept covered by insurance for the benefit of the consign-

ors." Certain goods in the possession of the defendants having been destroyed by fire while uninsured, plaintiff brought this action to recover their value. *Held*, that this contract was one of bailment and not of sale, and that the defendants were the *del credere* agents of the plaintiff.

That the defendants as agents, were under no obligation by the contract to insure the goods, and that the notice printed on the invoices did not impose such obligation since the special contract between the parties could not be altered by an act of the plaintiff alone.

That since the goods at the time of their loss by fire were the property of the plaintiff company, the loss falls on it.

That a prayer offered by the plaintiff was properly refused when it instructed the jury to find for the plaintiff if they found that the goods were consigned to the defendants with invoices plainly requiring them to be insured for the benefit of the consignor, that the goods were accepted by the defendants without objection, that no such insurance was made and that the goods were destroyed by fire. Such prayer ignored defendant's evidence to the effect that the goods were consigned to them under an express contract which did not require them to effect insurance.

*Decided December 3rd, 1907.*

Appeal from the Superior Court of Baltimore City (NILES, J.)

*Plaintiff's 1st Prayer.*—If you find that the goods, the subject of this suit, were consigned by the plaintiff to the defendants with invoices plainly requiring "stock to be covered by insurance for the benefit of the consignor," that the goods were accepted by the defendants without objections that no such insurance was made and that the goods were destroyed by fire, then the plaintiff is entitled to recover. (*Refused.*)

*Plaintiff's 3rd Prayer.*—If the jury shall find that the plaintiff shipped to the defendants all or any of the goods mentioned in the paper marked Exhibit No. 37, offered in evidence, without any directions as to insurance, but under the contract that defendants were at liberty to sell said goods to their customers at any price they liked and to receive payment for them at any time they liked, but were bound when they sold them, to pay the plaintiff for them at the net prices fixed

by the invoices, and at the times thereon specified, wholly in-
dependent of what the defendant's contract might be with the
persons to whom they sold, and over and above the expenses
for freight, drayage, storage and labor, all which were to be
paid by the defendants, then, whatever the parties may have
thought, their relations as to such goods were those of vendor
and vendee and not of principal and agent, and if the jury
shall further find that while the said goods were in the cus-
tody of the defendants for sale, they were destroyed by fire
without the fault of the plaintiff then the plaintiff is entitled
to recover in this action the value of said goods so shipped
at the prices fixed by the invoices, together with interest
thereon in your discretion from the time when they were so
destroyed. (*Refused.*)

The cause was argued before PAGE, BOYD, PEARCE,
SCHMUCKER, BURKE and ROGERS, JJ.

*Wm. Reynolds*, for the appellant.

The first question for the Court to decide in the case is that
raised by the plaintiff's third prayer, which was rejected by
the Court below. This prayer is founded on the decision of
the English Court of Chancery Appeal, in the case of *ex parte
White in re Nevill*, L. R. 6 Chy. App. 397, in which SIR GEO.
MELLISH, L. J. (page 403) said: "If the consignee is at liberty,
according to the contract between him and his consignor, to sell
at any price he likes, and receive payment at any time he likes,
but is to be bound if he sells the goods to pay the consignor
for them at a fixed price and at a fixed time—in my opinion
whatever the parties may think, their relation is not that of
principal and agent  *  *  *  and my opinion is that in
point of law the alleged agent is making, on his own account,
a contract of purchase with his alleged principal, and is again
re-selling."

The above language was quoted by this Court *in extenso* in
its decision of the case of *Curtis* v. *Gibney*, 59 Md. p. 154,
with the comment: "We consider these to be sound views;"

and the same statement was reiterated in the subsequent case of *Gibney* v. *Curtis*, 61 Md. p. 198.

The facts in the case of *ex parte White* as stated by SIR WM. JAMES, L. J., on page 399, are almost identical with those of the case at bar. He says: "We have no written document showing the relationship between the parties, or stating the terms on which the business was to be carried on between them ; but we have a course of dealing extending over a number of years and such a lengthened course of dealing is often the most satisfactory mode of showing the intention of the parties, and what their relations were.

"It is clear from the course of dealing that the bargain was substantially thus: Mr. Nevill was to dispose of the goods sent to him by Towle & Co. and was not to pay for them unless he disposed of them, and he was to return at the end of every month, an account of sales that he had actually made; and then after the lapse of another month he was to pay in cash for the amount of the goods which he had so disposed of according to their values as fixed by a price list sent to him. It does not appear that he ever was expected to return any particular contract or the names of the persons with whom he had dealt. He pursued his own course in dealing with the goods, * . * * and he sold them on what terms he pleased as to price and length of credit."

Now it is perfectly clear from the testimony of Mr. Dugan, Sr., that his relation to the plaintiff as to nineteen-twentieths of the goods shipped on his orders was that of a vendee and not of an agent, for the goods, although shipped direct to the customers to whom he had sold them and to whom he rendered bills for the price in his own name, were billed by plaintiff to defendants as "sold" to them and were paid for by defendants at the list prices irrespective of the prices at which the customers bought them or whether the latter ever paid defendants for them or not. It is true that the parties appear to have both spoken of this business as an "agency," but, as the Court remarked it to have been conceded in the argument in *ex parte White*, there was no magic in the word "agency"

which is often used in commercial matters when the real relationship is that of vendor and purchaser.

There can be no possible question but that the title passed from the plaintiff as to these goods the moment they were shipped by it. But how about the goods that were sent to defendants to be kept in stock for sale as customers might be found and which were all invoiced as "consigned?" Of course there is no more magic in the word "consigned" than there is in the word "agency," and the true relation of the parties to a contract must be determined not by any name which they may have given to the instrument, but by their ruling intention gathered from all the language they have used. It is the *legal effect of the whole* which is to be sought for. See *Hereford* v. *Davis*, 102 U. S. 243.

The defendants' rights and power over these were as a matter of fact identical with those they had over the goods shipped by plaintiff directly to their customers as sold to the defendants. Defendants paid the freight on these "consigned" goods, sold them when they pleased and to whom they pleased and for what they pleased, and meanwhile held them in possession, the only obligation assumed by them, according to Mr. Dungan, Sr.'s, testimony, being to pay for them the plaintiff's list prices net thirty days after they were sold. It is submitted that no substantial distinction can be drawn between the goods thus kept in stock by the defendants and those shipped by the plaintiff directly to their customers, and that in point of law they were equally sales by the plaintiff to the defendants, and in each case the right of property passed from the plaintiff as soon as they were shipped.

As declared by the Supreme Court in *Sturm* v. *Boker*, 150 U. S., page 327: "The recognized distinction between bailment and sale is that when the identical article is to be returned in the same or some altered form the contract is one of bailment and the title to the property is not changed. On the other hand, when there is no obligation to return the specific article and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return and the property is changed; the transaction is a sale."

Here there is not the slightest evidence that the return to the plaintiff of the goods described as consigned by it was contemplated by either party to be made under any circumstances, but on the contrary it was expressly provided that they should be paid for at the list prices thirty days after the defendants sold them. It is true that nothing was said about *when* payment should be made in case the defendant never sold the goods, but this eventuality is fully provided for by the well-established rule of law that where goods are sold and delivered to be paid for upon the happening of some future event, the vendor may recover though the event on which payment is made to depend has been made impossible by an accident. This rule was recognized by this Court in the case of *Farmers' Phosphate Co.* v. *Gill*, 69 Md. 545.

The Court there cited approvingly the case of *Alexander* v. *Gardiner*, 1 Bing. (N. C.) 671, in which there was a stipulation in the contract that the goods were to be paid for "by a bill at two months from the date of landing." The goods were shipped from Sligo, in Ireland, to London, and while in transit were lost or damaged by shipwreck. In an action by the vendor against the vendee for goods bargained and sold this term of the contract was relied on by the defendant, but TINDAL, C. J., said, "the object of that stipulation was merely to fix the time of payment, and not to make the landing a condition precedent," and the plaintiff was held entitled to recover. See also *Upton* v. *Holmes*, 51 Conn. 503; *Rathrauf* v. *Hagenbach*, 58 Pa. St. 103; *Granite Roofing Co.* v. *Hasler*, 82 Mich. 466.

The doctrine laid down in *ex parte White in re Nevill* has been affirmed and applied in many cases in the Courts, notably in those of the Arbuckle contracts. *Arbuckle* v. *Kirkpatrick*, 98 Tenn. 221; 60 Am. St. R. 854; 36 L. R. A. 285; *Snelling* v. *Arbuckle*, 114 Ga. 362; 30 S. E. 863; *Arbuckle* v. *Gates*, 95 Va. 802; 30 S. E. 496.

In these cases the whole subject is fully gone into. Arbuckle Brothers, wholesale dealers in coffee, devised an elaborate form of contract, copyrighted by them, and designated

as a "special factor appointment," under which they undertook to consign their coffee to the various "agencies," through whom it was sold upon terms very similar to those under which, according to Mr. Dugan, Sr.'s testimony, the fans and blowers were consigned to him by the plaintiff in this case, and in all three of the cases the Courts held that under its provisions the true relation of Arbuckle Brothers to their so-called agents was really that of vendor to vendee.    In one of these cases, *Arbuckle* v. *Gates*, the Court very pertinently says: "The agreement was an attempt to accomplish that which cannot be done—to make a sale of personal property and at the same time constitute the buyer simply an agent of the seller to hold the property until it is paid for.    The two things are incompatible and cannot co-exist.    The agreement had in it every element of sale.    It was in substance and effect a sale and must be so declared."

Among the many cases cited in the opinion in the three Arbuckle cases as supporting the doctrine of *ex parte White in re Nevill*, there followed, special reference is made to *Chickering* v. *Bastress*, 130 Ills. 206; 17 Am. St. R. 309 (affirmed in *Peoria Co.* v. *Lyons*, 153 Ills. 427). And *Braun* v. *Keally*, 146 Pa. St. 519; 28 Am. St. R. 811.

In *Williams* v. *Drummond Tobacco Co.* (17 Tex. Civ. App. 635; 44 S. W. 185), the Court in holding a contract similar to that in the case at bar, which purported to be one of agency, and expressly declared that the property in the goods consigned should remain in the consignor until they were sold by the consignee, to be nevertheless clearly a contract of sale, relied for this conclusion mainly upon the fact that in it, as in this case, *the consignees were given no right to return the goods under any circumstances, and the consignors did not reserve the right to retake them.*

The case of *Bicking* v. *Stevens*, 69 Mo. App. 168, is on all fours with that at bar.    There Bicking consigned goods to Campe "to be sold on our account."    The arrangement was that Campe was to sell them when, to whom, for what price, and upon what terms he chose, but was to pay Bicking for

them when sold at a price fixed by the latter. The Court
held that the transaction was a sale and that the goods re-
maining in Campe's hands unsold passed under a deed of as-
signment made by him in trust for certain of his creditors.

In *Baker* v. *Turner*, 19 App. Div. N. Y. Supreme Court 22,
it was held that when, between certain dates, a firm would
consign as many flags as its consignee would order, and on a
later date the consignee would render an account and pay to
the consignor from the amount received for said flags the
amount at which they were billed to the consignee, a corpo-
ration whose power of sale was unlimited and which could re-
turn flags left unsold or return them at the consigned price,
the relation between consignor and consignee was merely that
of creditor and debtor, because the latter had the right to sell
at less than the consigned price or take the flag itself; and that
after it had gone into the hands of a receiver, the consignor
could not claim from him any preference over other creditors
from the proceeds of the flags sold in the hands of the re-
ceiver.

The general result of all the cases is thus briefly summed
up in the *Am. & Eng. Ency. of Law*, 1st ed. vol. 21, page 520,
2nd. ed., vol. 24, p. 1026. "In the case of goods consigned to be
sold for the consignor, who is to regulate the prices and terms
of sale, the factor is an agent and the contract one of bailment
* * * If, however, the consignee or factor is to sell upon
terms fixed by himself, and is bound to pay to the consignor a
fixed price, the contract is one of sale."

Measured by this standard, the contract in this case was
undoubtedly one of sale, and the Court below erred in reject-
ing the plaintiff's third prayer and in granting the ninth prayer
of the defendant, and in the second paragraph of its own in-
structions.

Whether the contract is held to be a bailment or a sale, if
the defendants undertook to keep the goods insured for the
benefit of the plaintiff they are equally liable to it for any
damages it suffered by their failure to do this. Of course if
the contract be held a sale and the plaintiff entitled to recover

from the defendant the full price of the goods, with interest in the discretion of the jury, it cannot recover additional damage for defendants' failure to insure them, for in such case its damage from such failure would be covered by the interest, but if the contention of the Court below that the contract was a bailment be upheld, then the defendants by their failure to insure the goods become liable to the plaintiff for the entire loss it has suffered thereby, which is the amount that would have been recovered from the insurance companies upon the policies if they had been taken out as required. For while a factor is not in all cases bound to insure the goods of his principal, yet he *may assume* such obligation, and by so doing render himself liable for any damage his principal may suffer from the failure to discharge the obligation. *Smith* v. *Lascelles*, 2 Term R. 187.

It is not necessary that the order to insure should be actually endorsed upon or incorporated in a technical bill of lading. It may be written upon the invoice or in a letter inclosing it. The essential point is that it be brought fully to the notice and attention of the consignee prior to or at the time of his acceptance of the consignment. Thus, in *Lorraine* v. *Cartwright*, 3 Wash. C. 151, 15 Fed. Case No. 8500, it was held that "if consignee accepts consignment, he does it on the terms prescribed by the shipper. He might have rejected it, but he cannot, after accepting it, refuse a compliance with the orders which accompanied it." The orders thus referred to were contained in letters enclosing the invoices sent with the consignment; and in *Blot* v. *Boiceau*, 3 N. Y. 78; 51 Am. Dec. 345, it was held that a factor was bound to obey instructions in a letter enclosing the invoices, and received by the consignee before the consignment arrived.

In *Schoenfeld* v. *Fleischer*, 73 Ills., page 404, the Court says: "It is the settled law that factors having the goods of their principals in their possession *may* insure, but they are not *bound* to do so, *unless they have received orders to insure* or promise to insure, or the usages of trade or the habit of dealing between them and their principal raises an obligation to insure."

It is true that in *Storm* v. *Boker*, 150 U. S., pp. 312, 327, relied on below by defendants' counsel, the Court held that *the express terms of a written contract* for the consignment of specified goods could not be controlled, modified or altered by the printed bill head of an invoice sent with the consignment, but that was an entirely different case from this.   Here there was no express written contract for the consignment of the goods in controversy, and as Mr. Dugan, Sr., himself testifies, there never was any formal written agreement as to consignments made between the parties at all.   In 1869 Mr. Dugan, Sr., wrote to Mr. Sturtevant soliciting the agency of his goods, and the latter began sending them, and continued to do so until his death, in 1890; and Mr. Dugan says he does not know whether the business was exactly an agency because he had no. exclusive right to the sale of Sturtevant's goods in any territory, the latter always selling here to others as he pleased. It is apparent that the terms upon which the first goods were consigned, in 1869, must be ascertained from the correspondence between the parties at that time, and that subsequent consignments may by implication be assumed to have been made upon the same terms except so far as these terms can be shown to have been modified by subsequent contract or by the course of dealing between the parties.   The original correspondence having all been destroyed, and none of the parties having apparently seen it for many years, the general course of dealing between them is the source upon which we must mainly depend in order to ascertain their legal rights and obligations in the premises.   Both sides are agreed that defendants were to get the goods at Boston and pay the freight on them to Baltimore and were to return the plaintiff *a net price fixed by it,* payable when the goods were sold or within thirty days thereafter. This price was fixed by the allowance. of a discount on the plaintiff's list prices, and this discount has been changed several times since 1884, and has ranged from 25 to 40 per cent. from the list prices.   The fact of the agreement that the plaintiff should in all cases receive a *net* price for its goods to be fixed by it, and the fact that the requirement to keep the

goods covered by insurance for the benefit of the consignors appeared on all the invoices are of controlling importance in determining the legal effect of the course of dealing established in this case.   The defendants admit that they thought of insuring the Sturtevant stock but failed to do so because of the *mistaken idea* which Mr. Dugan, Sr., had got into his head that the Sturtevant Company always insured its stock in its various agencies, because George F. Blake & Co. did so. Had this idea been correct it might have afforded a valid reason for not insuring, but how could the defendants be justified in assuming it to be correct with the memorandum on every invoice plainly before their eyes?   Every such memorandum was full notice to the defendants that the goods described in that invoice were consigned to them upon the condition that they should be kept covered by insurance for the benefit of the consignors, and therefore the plaintiff's first prayer, which is identical with the first paragraph of the Court's instruction, is a correct statement of the law.   There is just as much reason to hold the defendants bound in this case by the terms of the conditions printed on all their invoices as there is to hold the shipper by an express company bound by the terms of its printed receipts.  *Brehme* v. *Adams Express Co.*, 25 Md. 328.

*Thomas G. Hayes* (with whom was *Ferdinand C. Dugan* on the brief ), for appellees.

1. The first question presented on this appeal, is whether or not, the appellees, Cumberland Dugan & Co., ever expressly or impliedly agreed to insure the machinery held by them as factors on consignment, and destroyed by the great Baltimore fire in February, 1904, for the benefit of the appellant, B. F. Sturtevant Company, their consignor.   The appellees positively contend that they never did so agree.   The uncontradicted testimony shows that B. F. Sturtevant and appellees began their dealings as consignor and factor thirty-five or forty years before this suit.   That this dealing, just as it previously existed with B. F. Sturtevant individually, was continued when the appellant became the successor in the busi-

ness to B. F. Sturtevant. The contract of bailment thus made between B. F. Sturtevant and the appellees was never subsequently, by mutual consent or agreement modified. This contract of bailment originally made and continued with appellant was, that the machinery in question was to be consigned to the appellees and that the only payment to be made out of the per centum allowed the appellees as commissions for their service as factors, was the *freight* charges on the machinery from Boston to Baltimore. The appellant while not denying this original contract, and its continuance up to the fire, attempts to escape its legal effect, by claiming that the machinery destroyed by fire, and involved in the suit was consigned to appellees and accepted by them on invoices, at the bottom of which was printed in small type the words "*Stock to be kept covered by insurance for the benefit of the consignor.*" The answer of the appellees to this contention is that they nor any of their employees, ever saw or had notice or knowledge of these printed words on the invoices, and that they never knowingly accepted the machinery on the terms printed in these invoices or ever agreed to a modification of the original contract made thirty-five or forty years before this suit. The *freight* was all they agreed to pay, that insurance was not mentioned in the original contract, and hence was excluded. Nor had they, the appellees, by letter, orally, or otherwise, been ever instructed by the appellant to insure the machiney for their benefit.

On these facts, which appear in the record without contradiction, the appellees confidently contend:

*1.* In the absence of contract or usage to insure, no duty is imposed on the factor to insure the consigned goods, unless there are *clear and distinct instructions given* to the factor by the consignor.

Can it be rightfully or legally said that the words "Stock to be kept covered by insurance for the benefit of the consignor" never seen by appellees printed in the smallest of type at the extreme bottom edge of long invoices, without a word by letter or orally, calling the attention of the appellees to this

printing, was a *"clear and distinct"* instruction to the factor to insure this machinery for the benefit of the consignor? It is thought not, especially, as the contract or agreement between the parties which had subsisted nearly thirty-five or forty years before the machinery was destroyed by fire, did not impose the duty on the factor to insure.

The law as to the necessity for *"clear and distinct"* instructions to the factor is thus given by recognized standard authority; "In order that the instructions shall be binding on the factor, it is necessary that they be *clear and distinct*, as it is only a reasonable and just rule, that the factor shall not be liable for a departure from instructions which lack these characteristics." 12 *A. & E. Ency. Law*, 646. In the Federal case of *Odorless R. Co.* v. *North Bennington Boot Co.*, 18 Fed. Cases No. 10, 438, JUDGE SHIPMAN decided that a subsequent parol undertaking by a factor *"see to"* or *provide* for insurance does not render him liable for the loss of goods by fire when there was no agreement in the contract as to the factor's agency, that the factor should keep the goods insured and where there was no showing that the factor had been instructed to insure.

The law does not impose the duty on the factor to insure in the absence of usage or a contract unless instructed to insure by the consignor. This law is thus stated: "It is not the duty of a factor to insure the goods of his principal unless *instructed* so to do, unless a *usage* of trade make it his duty so to do, unless some understanding exists between principal and the factor that the goods in question shall be insured." 19 *Cyc.*, 123; 12 *A. & E. Ency.*, 656.

Apply now this universally accepted law to the facts of the case at bar. It must be conceded that there was no usage of trade, none is set up by the appellant. The understanding under he original contract which was never changed was not to insure but to pay only freight on the consigned machinery from Boston to Baltimore. That leaves for our sole inquiry: Did the appellant legally, in a *clear and distinct* manner ever *instruct* the appellees to insure the machinery in question for the ben-

efit of the appellant? The only answer to this inquiry by the appellant is these printed words in small type at bottom of long invoices, never seen by appellees.

2. Invoices, with any and all printed matter on them, are never contractual in purpose, object or legal effect, but are only a list containing the items with prices and charges. This definition of an invoice is thus given: "A list sent to a purchaser, factor, consignee, etc., containing the items, together with prices and charges of mechandise sent, or to be sent, to him." 23 *Cyc.* 351. "An invoice is not a bill of sale, nor is it evidence of sale. It is a mere detailed statement of the nature, quantity and cost or price of the things invoiced, and it is as appropriate to a bailment as it is to a sale." *Dows* v. *Nat. Ex. Bank*, 91 U. S. 630. It is quite apparent from these authorities, that an invoice is but a list price, and that the printing by the appellant of these words about insurance, at the bottom of the invoices, could not in the absence of these printed words being brought to the knowledge of appellees be said to modify or alter the original contract. The receipt and acceptance of the machinery in question by the appellees accompanied by invoices with these printed words on them, unseen by the appellees could not be considered in law as an agreed condition on the part of the appellees of acceptance of the consigned machinery, even if there had been no prior subsisting contract between the parties excluding insurance by the factor for the benefit of consignor. An invoice, under such circumstances, as will be shown elsewhere, can never be made to alter or modify a prior subsisting contract without the knowledge and consent of the factor.

3. When by an express and special contract between consignor and factor, the latter is relieved of the duty to insure the consigned goods, subsequent instructions from the consignor to so insure, impose no duty or obligation on the factor to obey such instructions.

The principle of law upon which the above proposition is founded is; That when a contract is made neither party has the legal right to add to it new terms or conditions without

the agreement or consent of the other party.    Such attempts
by one of the contracting parties are mere nullities.    The
meeting of the minds of both parties is not only a vital requi-
site of any contract, but equally requisite to modify or alter
any pre-existing contract.    There are many decisions in which
this very thing was attempted to be done, as is attempted in
the case at bar.    That is, to change a prior subsisting contract
by words printed on the invoices.    The Courts have invariably
decided that this could not be done, and in all the cases, in
which this question has arisen, the Courts have held that the
words printed on the invoices, in so far as they were in con-
flict or opposed to the original contract, were nullities.

Some of such cases are the following: *Sturm* v. *Boker*, 150
U. S. 326, 327; *Brittian Co.* v. *Birkenfeld*, 20 Mon. 347; *Dale*
v. *See*, (N. J. L.) 5 L. R. A. 585; *Ferguson* v. *Porter*, 3 Fla.
27.    The underlying principle of law upon which the above
Courts found their respective decisions is, thus stated by a
standard authority: "When the consignment is made under an
express agreement, the factor, of course, is *not bound to follow*
subsequent instructions, *inconsistent with such agreement."*    12
*A. & E. Ency. Law* 646.    The Supreme Court of the United
States in *Sturm* v. *Boker*, *supra*, has thus expressed this rule
of law: "A printed bill head can have little or no influence in
changing the clear and explicit language of the letters, *and it
in no way controls, modifies or alters the terms of the contract.*
*    *    *.    The contract being clearly expressed in writing,
*the printed bill head of the invoice can, upon no well settled rule,
control, modify or alter it."*

This case is upon its facts identical with the facts in the case
at bar.    The question which arises in this case, and which
was decided, was whether the goods involved had passed from
one to the other of the parties as a bailment or sale.    The
party claiming it to be a sale produced invoices which had
written on them "Mr. H. Sturm in joint account with Her-
man Boker & Co" or "Bought of Herman, Boker & Co. on
joint account."    The prior letters between the parties used
the words "consign" and "consigned" and clearly imported a

consignment and not a sale.    Upon this fact the Court expressed itself as given in the above quotation.    In the case at bar the original contract between the parties was also made by letters which have been destroyed by the great Baltimore fire, but the secondary evidence of these letters shows without contradiction that insurance was not to be paid by the appellees on the machinery consigned, but only freight from Boston to Baltimore.    Could there be a more direct decision on the exact question involved in this appeal?    The case from the Supreme Court of Montana of *Britain Co.* v. *Birkenfeld supra*, thus states the same principle of law.    "But having shipped them (goods) under *one contract it had no right on its own motion to modify the terms thereof* * * *    It is an elementary principle, that the minds of parties contracting must meet before contract results.    The evidence is not sufficient to show that Genzberger, Barnett & Co., *agreed to the terms the plaintiff had on its bill heads or invoices.*"

4. A prior, subsisting contract between consignor and factor, relieving the factor of the duty to insure the consigned goods, cannot be modified or altered by any printed matter on invoices, unless such printed matter is known and consented to by the factor.

This proposition has abundant authority to sustain it.    The following leading cases give the proposition the fullest support, *Summers* v. *Hibbard*, 153 Ill. 102; 38 N. E. 900, 901; *Millhiser* v. *Erdman*, 103 N. C. 27; 9 S. E. 582; *Dale* v. *See*, (N. J. L.) 5 L. R. A. 585; *Sturm* v. *Boker*, 150 U. S. 326, 327; *Brittian Co.* v. *Birkenfeld*, 20 Mon. 347; *Fergerson* v. *Porter*, 3 Fla. 27.    The case of *Brittain Co. v. Birkenfeld*, *supra*, was in its facts the exact case presented on this appeal. The goods in that case were sold without any provision in the contract as to insuring the same by the purchaser.    When the goods were sent they were accompanied by invoices on which were printed the words *"Keep fully insured."*    Retention of goods will be considered acceptance of all terms herein."    The Supreme Court of Montana in deciding that the original contract between the parties could not be modified or altered by

these printed words on the invoices which accompanied the delivery of the goods, said; "The invoices containing the printed language which appears in the statement, were sent and received and Genzberger, Barnett & Co. retained the goods without objection. We are of the opinion that it cannot be inferred from said facts that there was any modification of the original contract entered into. * * * Having shipped them under one contract, it had no right on its own motion, to modify the terms thereof. * * * The evidence is not sufficient to show that Genzberger, Barnett & Co. *agreed to the terms the plaintiff had printed on its bills or invoices.*"

The authorities cited with others which might be given, if necessary, fully sustain the correctness of the Court's instructions. The form of the Court's instruction conjoining two views, one favorable to the appellant and the other presenting the views of the appellees in one instruction, without qualifying in any way, the one or the other, and instructing the jury to find accordingly as they might find the facts respectively, has received the express approval of this Court as to its form, in the case of *Livesey* v. *Miller*, 61 Md. 342.

The authority chiefly relied on in the Court below on this branch of the case, by the appellant, to meet the contention of the appellees was the English case decided in 1788 by the King's Bench of *Smith* v. *Lascelles*, 2 T. R. 187; 1 R. R. 457. The facts of this English case, with much respect to the able attorney of appellant, were as different and as far removed from the facts of the case at bar, as are the poles of the earth's axis. In this English case there was no prior subsisting contract as in the case at bar, relieving the factor of the duty to insure the consigned goods for the benefit of the consignor The controlling fact in this English case was that in remitting the *bill of lading*, not an invoice to the factor, the consignor acompanied the bill of lading with a *letter* directing him expressly in clear and distinct terms to insure the goods for the benefit of consignor, which he failed to do. This bare statement of the case is sufficient to show that this English case can in no wise impair the principle of law given in the preceding cted cases and upon which the appellees confidently rely.

II. The second ground upon which the appellant bases his claim to recover a judgment against the appellees is quite different, antagonistic and inconsistent with his first ground heretofore considered.   It is a complete abandonment of any right to recover, because of the alleged failure of the appellees to insure the consigned machinery, and consists of a substituted alleged right to recover from the appellees the invoice prices of the machinery in question, or in other words the appellant abandons his first claim, that the machinery was in the possession of appellees on a bailment for sale, and asserts that the machinery was sold to appellees, and it is sought to recover on the common money count in the declaration, for goods sold.   Vendor and purchaser is the new relation now claimed by the appellant as existing between itself and the appellees as to this machinery destroyed by the great Baltimore fire.   The first complete answer to this second contention of appellant is, that the whole record evidence offered by the appellant, invoices, letters and oral testimony, repeatedly declare that the dealings between the parties as to this machinery was that of consignor and factor, and this whole evidence of appellant never intimated any claim against the appellees but for an alleged failure to insure the consigned machinery.   The invoices put in evidence by the appellant have in bold letters printed on them "Consigned to *Cumberland Dugan & Co.*"   The letters filed by appellant always in express terms refer to the consigned machinery.   There is not a word or line in the whole of appellant's testimony but speaks of the consignment of the machinery.   So in the testimony of appellees as to the original contract and their accounting to the appellant after sale of any of the machinery after deducting their commission, all speak only of the goods as consigned, never one word has ever escaped either of the parties as to their dealing with this machinery, being a sale.   The intention and understanding of both of the parties to the contract as shown in all the testimony is and was, that the machinery in question was consigned to the appellees as the agents of the appellant to sell this machinery as factors.   If the intention and

understanding of the parties, as to the character of the contract which they entered into, has any weight, then it is not an open question, as both parties declare in their recorded testimony that it was a bailment for sale and not a sale. In speaking of the legal effect of the understanding of the parties as to whether a given transaction was a bailment of sale, one of the U. S. Circuit Court of Appeals has thus expressed the law: "But if the meaning was doubtful the fact that the parties to it *understood it to be* a contract of *bailment*, and *acted* upon that assumption, would remove the doubt." *Met. Nat. Bk.* v. *Benedict Co.*, 36 U. S. App. 609. The Supreme Court of the States on the same subject has said: "It is too clear for discussion or citation of authorities, that the contract was not a *sale* of the goods by the defendant to Sturm. The terms and conditions under which the goods were delivered to him import only a consignment. The words *"consign"* and *"consigned"* employed in the letters were used in their commercial sense, which meant that the property was committed or entrusted to Sturm for care or sale, and did not by any express or fair implication mean the sale by one or purchase by the other." *Sturm* v. *Boker*, 150 U. S. 326. The letters which have passed between the parties in the case at bar, as shown in the record, after the shipment of the machinery was made, in which the contract is referred to as a consignment is said as follows by a standard authority to be conclusive: "That the parties by their correspondence after the shipment construed it as a consignment for sale is conclusive." 19 *Cyc.*, 120 note, 49.

But the appellant, while necessarily conceding the facts above set forth, says whatever may have been the intention and understanding, of the parties as to its being a bailment, as shown in the invoices, letters and oral testimony in the record of both parties, yet in as much as the appellees had the right under the contract to sell the machinery for as much over the invoice price as they could, and keep this excess over the invoice price, together with the 25 per cent. allowed them by the appellant, makes it a contract of sale and not one of bail-

ment. This contention of the appellant is in conflict with a universally received rule of law, which is thus stated by a recognized authority: "The fact that goods are consigned for sale with the provision that the factor may retain on a sale of the property all the money *in excess of the invoice price* does not destroy the relation of factor and principal and render the transaction a conditional sale." 19 *Cyc.* 121. Many authorities could be cited to sustain this principle of law, as it is universally accepted as the governing rule in the relation of principal and factor, but only three of such leading cases will be referred to. They were cases which originated in bankrupt courts, where the trustee in bankruptcy resisted the claim of the original owner, who claimed that the goods in question were in the possession of the bankrupt, when he failed on contracts of bailment for sale, the bankrupt being the factor of the claimant, while the trustee claimed that the contract was one of a conditional sale and that the title had vested in the bankrupt. The three cases are: *In re Galt*, 56 C. C. A. 473, 474; 120 Fed. Rep. 64, *John Deere Plow Co.* v. *McDavid*, 70 C. C. A. 430; 137 Fed. Rep. 802. *In re Columbus Buggy Co.* 74 C. C. A. 613; 143 Fed. Rep. 859. In each of these cases the contract between the consignor and factor permitted the factor to sell the goods for as much as he could get above the invoice price and keep the excess, just as was done in the case at bar, and the Courts decided that this did not change the contract from bailment to sale. The appellant relied in the Court below as supporting its claim that the contract in this case was one of sale and not bailment, upon the Maryland case of *Curtis* v. *Gibney*, 59 Md. 154, which case approves and follows the English case of *Ex parte White in re Nevell*, 6 Chan. App. 397. If the contract in the case at bar, under which the machinery was consigned to the appellees is compared with the test given in the English case it will be found to differ in several respects from the test laid down by MELLISH, L. J., in the English case and approved by this Court, and hence this Maryland case of *Curtis* v. *Gibney*, *supra*, affords the appellant not the slightest support for its contention that

the contractual relation between the parties in the case at bar as to the destroyed machinery is that of vendor and purchaser. The distinguishing characteristics of a contract of bailment which differentiate it from a contract of sale are stipulations in the former, that the factor, expressly or impliedly, either obligates himself to return the consigned goods to the consignor, if not sold, or to return to the consignor the agreed or invoice price, less discount or commission, when the consigned goods are sold. These stipulations are the equivalents of each other. Any contract which has as a part of it either of the above stipulations is absolutely a contract of bailment and not a contract of sale. The Supreme Court of the United States has thus expressed this distinguishing mark of contracts of bailment: "The agency *to sell and return the proceeds, or the specific goods, if not sold*, stands upon precisely the same footing and does not involve a change of title." *Sturm* v. *Boker*, 150 U. S. 330. In the contract between the parties in this case the appellee, Mr. Cumberland Dugan, Sr., in his oral testimony stated, and it is uncontradicted, the following stipulation in the contract in question: "I understood that he (appellant) was entitled to be paid for the consigned goods within thirty days after a sale of them took place." With this express stipulation in the contract made by the parties, how is it in the light of the law as declared by the Supreme Court of the United States in the above quotation from *Sturm* v. *Boker, supra,* possible to say or claim the contract was not one of bailment ?

Rogers, J., delivered the opinion of the Court.

This is an appeal from the Superior Court of Baltimore City. The appellant (plaintiff below) is a Massachusetts corporation, doing business as a manufacturer of machinery, in or near Boston. The appellees (defendants) are a firm in Baltimore City, and have for nearly a half a century been engaged in handling and selling machinery as factors or commission merchants, and as such have been dealing with B. F. Sturtevant and the appellant for 35 or 40 years before this suit was brought. Having for that period of time, received consign-

ments of B. F. Sturtevant's and the appellant's machinery to be sold by them as factors, their principals being first B. F. Sturtevant, and next the appellant.

When the great Baltimore fire occurred, the appellees had in their custody in consignment, a lot of machinery of the appellants known as "blowers and fans." The great Baltimore fire destroyed this machinery, which was not insured. The appellant claims that it was the duty of the appellees as its factors, to have insured this machinery for the benefit of the appellant, and not having so insured it the appellees are liable to the appellant, and this suit is accordingly brought to recover the equivalent of the insurance, namely the market value of the machinery on the date of its destruction by fire. This claim of the appellant is based solely upon this contention—which is denied by the appellees—that the only instruction the appellant ever gave the appellees to insure said machinery were the printed words, "Stock to be kept covered by insurance for the benefit of the consignor," printed in the smallest type at the extreme bottom edge of long invoices, which it is claimed, which is also denied, accompanied the consignments of machinery.

It is also virtually admitted by the appellant, that no letter was ever written, or verbal instruction given, to the appellees to effect any such insurance; nor was there ever made of the appellees any inquiry, as to whether any such insurance had been made. The sole reliance of the appellant upon which it bases its right to recover, is the alleged instruction contained in these printed words on the invoice. The whole testimony of the appellant, its letters and depositions of its employees, attest the correctness of this statement. The appellees, in reply to this claim of appellant, prove by the uncontradicted evidence of Mr. Cumberland Dugan, Sr., the senior member of the appellee's firm, that 35 or 40 years before the beginning of this suit he, through correspondence, by letters (destroyed by fire) had with Mr. B. F. Sturtevant then the owner and conductor of the business, an express and special contract, under which, all machinery was to be consigned to his firm,

the appellees, as factors; that this contract has been ever since the time it was made in operation and effect, and the machinery destroyed by the fire was consigned to his firm, the appellees, under said contract and by the appellees so accepted.   Mr. Cumberland Dugan, Senior, having testified that all the letters in reference to this contract had been destroyed by the great Baltimore fire, gave the contract as made and set forth in these destroyed letters virtually as follows:  That about 1869 the correspondence took place by which Mr. B. F. Sturtevant then agreed to consign to the appellees for sale as his agents, the machinery made by him, and to pay the appellees certain compensation for selling the machinery, and one specified charge for expense was to be paid by the appellees on said machinery, which was to be put f. o. b. in cars at Boston for Baltimore consigned to the appelless.   That the appellees were to be allowed for their services and this one charge, twenty-five per cent, from the list or invoice prices of said machinery, and that the only thing above-mentioned the appellees were to pay out of this discount, was the freight from Boston to Baltimore. That insurance, was not named as an item, which his firm had to pay out of this discount for the benefit of Mr. B. F. Sturtevant or the appellant.   That under this express contract his firm had received consignments from B. F. Sturtevant until his death, and subsequently from the appellant, and that the machinery destroyed by the fire was accepted by the appellees under this contract.   He further testified without contradiction, that from the first consignment of the machinery until the great Baltimore fire, his firm had never received a word by letter or otherwise, modifying or altering this contract, or instructing his firm to insure the machinery for the benefit of B. F. Sturtevant or the appellant; that his firm always supposed B. F. Sturtevant and the appellant effected and carried its own insurance, on its consigned machinery, as was done by other machinery firms with which the appellees dealt as factors.

As to the invoices with printed words on them, Mr. Cumberland Dugan, Sr., and Mr. Cumberland Dugan, Jr., the two

appellees, who composed the firm of Cumberland Dugan and Company, and Mr. Lannon, their bookkeeper, without contradiction testified that they only received consignments with invoices about two or three every two years; that the invoices accompanying these consignments so far as they saw, had on them no such printed words, directing the appellees to insure the machinery for the benefit of the appellant; that if such printed words had been on the invoices they would certainly have seen them.    Mr. Dugan, Sr., further testified, that these printed words were not on the invoices accompanying the consigned machinery.    They all testified that no instruction was ever given by the appellant to appellees to insure the machinery for the benefit of the appellant, and that no inquiry was ever made as to whether any such insurance had been made.    On this testimony the Court of its own motion gave the following instruction covering the case, and submitted the case to the jury on this instruction, and the verdict of the jury was for the appellees.

By the Court:

"If you find that the goods, the subject of this suit, were consigned by the plaintiff to the defendants with invoices plainly requiring "stock to be covered by insurance for the benefit of the consignor," that the goods were accepted by the defendants without objection, that no such insurance was made, and that the goods were destroyed by fire, then the plaintiff is entitled to recover.

"But if, on the contrary, you find that the goods were consigned and accepted under a prior subsisting contract between the parties not requiring such insurance, then the defendants are entitled to your verdict.

"This means that whether the defendants are or are not liable to the plaintiff, depends upon the terms of the contract under which the goods mentioned in the evidence were held by the defendants.    It means that the question of what were the terms of this contract is a question for the jury to decide from all the evidence in the case.

"It means that there is sufficient evidence from which the

jury may find that the clause upon the invoices requiring "stock to be covered by insurance for the benefit of the consignor" whether or not read by the defendants or their agents was upon the invoices sent with the goods above mentioned and did in fact form a part of the contract under which the said goods were held at the time of the fire.

"And if they so find their verdict must be for the plaintiffs.

"It means that there is sufficient evidence from which the jury may find on the other hand, that the said goods were held by the defendants at the time of the fire under a contract which was entered into prior to the sending of whatever invoices were sent and which was at the time of the fire still subsisting in which contract there was no provision requiring insurance.

"And if they so find their verdict must be for the defendant.

"It means that the jury are to look at the whole evidence in the case and from it to determine whether by express agreement or by such conduct on the part of the defendants as the plaintiff had the right to rely upon as evidencing an acceptance of the insurance clause above mentioned printed on the invoices (if the jury shall find that invoices with such clause printed thereon were received by the defendants) the said clause as to insurance was a part of the contract between the parties under which the said goods were held at the time of said fire."

The contention of the appellant is that the relation between the parties to this suit is that of vendor and purchaser and that it has the right to recover the value of the machinery on the count for goods sold and delivered, which is one of the counts declared on.

The appellant offered a prayer on this theory which was rejected by the lower Court, and this forms one exception. There were two other prayers offered by the appellees and granted, which relate to minor questions and to which exceptions were taken; one was the often approved prayer by this Court, relating to the burden of proof being on the appellant to prove its case to the satisfaction of the jury by a prepon-

derance of evidence. The other granted prayer of the appellees was based on the theory of the appellant as to the printed words as to insurance being on the invoices for the benefit of the appellant. The jury were told if these printed words were not on the invoices, under the evidence, the verdict of the jury should be for the appellees. To the granting of this prayer the appellant also excepted. There was no special exception to these granted prayers as to the insufficiency of the evidence to support their hypothesis or that a question of law was submitted to the jury.

Another prayer offered by the appellant which was refused by the lower Court, also forms an exception. This prayer segregated solely the appellant's evidence and omitted all of the appellees,' as to a prior and subsisting contract between the parties as to the terms or conditions of the consignment of the machinery in question. This refused prayer of the appellant, in its exact words, was incorporated in the Court's instruction and given to the jury. The fault of the appellant's first prayer is that it segregated the plaintiffs testimony on a certain point, and omits entirely the defendants on the same point, and directs the jury, if they believed them to find for the plaintiff, while if the jury found the defendants' testimony to be true, would not have justified the conclusion of the prayer or the findings of the jury. The prior subsisting contract between the parties as sworn to by the appellee was entirely omitted from the prayer. And again the plaintiff had the benefit of the law it was intended to embrace in the exact words of the lower Court's instructions. Again the plaintiff's third prayer was properly refused because there was no sufficient evidence to support it. The testimony of both parties we think conclusively show that the dealing as to the machinery in question, was a clear and distinct bailment for sale, and not a sale. The machinery was to be sold to purchasers for not less than the list or invoice price, and was not purchased by the appellees. The machinery could not be sold by the appellees at any price they liked, or payment received at any time they liked. Until a sale to a third party, the machinery belonged to the

appellant, and at any moment it could have revoked the factor's agency and had the machinery returned to it.    This prayer was properly refused by the lower Court.

Prayers must be consistent, and a fatal objection to this prayer is, that the plaintiff's second granted prayer, is in direct conflict in theory and conclusion to this prayer.

In order that instructions shall be binding upon the factor, it is necessary that they be clear and distinct, as it is only a reasonable and just rule, that the factor shall not be liable for a departure from instructions which lack these characteristics. 12 *A. & E. Encyc. Law*, 646.    Even admitting that the invoices had the notice to insure which is flatly denied by the appellee, can it be said that they were "clear and distinct?" It is not the duty of a factor to insure goods of his principal, unless instructed to so do, unless a usage of trade makes it his duty so to do, unless some understanding exits between the principal and factor that the goods in question shall be insured.    19 *Cyc.*, 123.    Though a factor has power to insure the goods of his principal, and may even do so in his own name, still, as a general rule, he is under no obligation to do so.    The obligation to insure may however, be imposed upon the factor by a general usage or custom to that effect, or by instructions of the principal, or by an agreement or course of dealings between himself and his principal imposing such duty upon him.    12 *A. & E. Ency. Law*, 659.    There is no proof of any general usage or custom in this case for the factor to insure; on the contrary the defendaut swears positively that he never insured the machinery consigned to him by the appellant or other consignors.    The uncontradicted testimony is that the appellant never by letter, verbally or otherwise, instructed the appellees to insure the machinery in question for the benefit of the appellant.    Nor was any inquiry ever made by the appellant as to whether the machinery was insured. The only agreement between the parties was an express and special one impliedly that there was to be no insurance by the appellees for the appellant's benefit in the machinery—because freight alone from Boston to Baltimore, was to be paid

by appellees out of the discount received by them, and nothing else. Again for 35 or 40 years the question of insurance had never been suggested in the remotest manner by the appellants, nor in point of fact had there ever been any insurance placed upon the machinery of the appellants in the appellees' possession, by the appellees, although their dealings for 35 or 40 years had been carried on along the same lines between these parties. Contracts are not made or unmade, modified or altered, on invoices. An invoice "Is a list sent to a purchaser, factor or consignee, &c., containing the items together with prices and charges of merchandise sent or to be sent to him." 23 *Cyc.*, 357. "An invoice is not a bill of sale, nor is it evidence of a sale." Even when the goods were described as bought and shipped on account of and at the risk of the drawee. *Dows* v. *Nat. Ex. Bank*, 91 U. S. 630. Again the Supreme Court has said that, "A printed bill head can have little or no influence in changing the clear and explicit language of the letters, and it in no way controls, modifies or alters the terms of the contract. The contract having been clearly expressed in writing, the printed bill heads of the invoice can, upon no well settled rule, control, modify or alter it. *Sturm* v. *Boker*, 150 U. S. 326.

Applying this to the case before us, we have a contract of consignment made by letters, which were destroyed it is true, but their contents were sworn to by Mr. Cumberland Dugan, Sr. In that contract the only payment to be made out of the discount received by the appellees was freight; no duty to insure was imposed upon them. The question of insurance if required by appellants might have prevented any dealings between these parties. We do not think that the device suggested, if it ever existed, could modify, change or alter the prior, subsisting contract made by the destroyed letters. For when a contract has been entered into between two parties, neither party alone, has the legal right to add to it new terms or conditions. Such attempts are nullities, and carry with them no legal obligation to be respected or obeyed by the other party, for if the consignor can add one, he can add a

dozen. "Where the consignment is made upon the express agreement, the factor of course is not bound to follow subsequent instructions, inconsistent with such agreement." 12 *A. & E. Ency. Law.* 643. For having shipped the goods under one contract, it had no right on its own motion, to modify the terms thereof. It is an elementary principle that the minds of parties must meet before a contract results. Each of these notices being in itself a nullity, it is inconceivable how, upon any legal principle, the frequency with which they were repeated, could create out of them a contract on the part of the plaintiff, without a scintilla of evidence of assent on the part of the defendant to the terms expressed in them, and not supplemented by some evidence that the original purchase or shipment was made upon such terms. And when we consider the long number of years through which contract had run, the uncontradicted testimony of the appellee that their dealings were under an express contract, and that this contract continued without modification, until the machinery was destroyed by the Baltimore fire, we are forced to the conclusion that the appellees are not liable to the appellants. The law sought by the appellant in his first refused prayer as we have said was based upon a hypothesis which had no evidence to support it, but that prayer cannot be considered in this Court because no special exception to the prayer was taken on this account.

We think the Court committed no error in granting the appellees ninth prayer as well as the sixteenth, 66 Md. 498-500. Rule 4 of this Court, Code, Art. 5, sec. 9. No special exceptions having been taken because of insufficient evidence to support its hypothesis, assumption of facts, or submitting a question of law to the jury.

We have already given our reasons for supporting the action of the learned Judge below in refusing the appellants' first prayer.

As to the appellants' third prayer which asked the Court to rule as a matter of law that there was a sale of the machinery to the appellees, and that they are liable as purchasers or vendees on the common money counts of the

declaration for goods sold and delivered. The relation of vendor and purchaser is assumed by the prayer to have existed between the parties as to this machinery. The first fatal error of this prayer is, that there is not a scintilla of evidence to support its hypothesis. We think the testimony of the appellant and appellee as to this machinery shows that the relation of factor and principal existed between them. Indeed the testimony shows that the appellees were *del credere* agents of the appellants for the sale of this machinery, for it is a conceded fact that they guaranteed the payment of the purchase price due by the purchaser for the machinery. The testimony shows that the contractual relations between these parties was dual. In one of the relations there was a *sale*, the machinery was *"sold"* by the appellant to to the appellees. In the other relation there was a bailment for sale; the machinery was "consigned" from the appellant to the appellees to be sold by the latter as agents of the former. These dual relations are most clearly shown in the exhibits and testimony appearing in the record. The intention, as well as the expressed understanding of the parties, as to both of their relations, is unmistakable.

It is the solely consigned machinery which is involved in this suit. In the sold machinery, the invoices always contained, as appears from appellees exhibit No. 1 the words "sold to Cumberland Dugan & Co." This sale to the appellees was when the appellant sent machinery direct to the purchaser from its factory, and billed the goods as above, directly to the appellees. While in the case of the machinery "consigned" to the appellees, as appears from the appellants exhibits 7, 8 and 9, the word "consigned" was printed upon the invoices. The contract entered into between the appellant and appellees as to the consigned machinery is uncontradicted, and is thus set out in the appellees letter to appellant of March 6th, 1905, and filed as appellants Exhibit 36 and is as follows: "Some 35 years ago you commenced consigning us fans and blowers. You told us to net you a certain price, being a discount. You allowed us, all over that we sold the machines for, belonged

to us." Mr. Cumberland Dugan, Sr., in his testimony con-
firms this statement in this letter.   His testimony is as follows:
We solicited the agency from B. F. Sturtevant.   The arrange-
ment was: "He was to ship the goods to me, and ship them
at a certain price and we were to sell them, and pay freights,
and all was over his price, we were to take."   Again he said
"'We never had any special time fixed when we had to remit."
Again there was no particular time to pay him.   We paid in
sixty, ninety days and four months, but he could demand in
thirty days.   We think that from the evidence in this case
that there was a bailment for sale, the letters of both parties,
the invoices of the appellant appearing in the record have been
critically examined, and they all show, we think conclusively,
that the understanding of both parties was that the machinery
was a consignment, and the contract between the appellant
and appellees as to the machinery destroyed, was a bailment
for sale or agency, and not a sale.   The Supreme Court of
the United States in *Sturm* v. *Boker*, 150 U. S. 326, *supra*,
expressly decided in a question of bailment or sale, that the
use of the words "consign" and "consigned," employed in
letters between the parties, were used in their commercial
sense, and that in arriving at the terms and conditions upon
which the goods passed from one of the parties to the other,
these words must be given due weight and proper consid-
eration.   "It is too clear for discussion or the citation of
authorities, that the contract was not a sale of the goods by
the defendant to Sturm.   The terms and conditions under
which the goods were delivered to him import only a consign-
ment.   The words "consign" and "consigned" employed in
the letters were used in their commercial sense, which meant
that the property was committed or entrusted to Sturm, for
care or sale, and did not by any express or fair implication
mean the sale by one or purchase by the other."   There is
nothing in this record to show, either directly or indirectly,
expressly or impliedly "the sale by one or the purchase by
the other."   Could a creditor of Cumberland Dugan & Co.
have seized the machinery in question?   Can any one doubt

that a Court on the evidence of both parties in this case would have promptly recognized the title of B. F. Sturtevant Company, and given it possession of this machinery? That the parties by their correspondence after the shipment construed it as a consignment for sale is conclusive. 19 *Cyc.* 120 note 49. The fact that goods are consigned for sale with the provision that the factor may retain in a sale of the property all the money in excess of the invoice price does not destroy the relation of factor and principal and render the transaction a conditional sale. 19 *Cyc.* 121. Exhibit 36 says: "You told us to net you a certain price, being a discount. You allowed us all over that we sold the machines for, belonged to us." And the testimony of Mr. Cumberland Dugan, Sr., was "The arrangement was: he was to ship the goods to me, and ship them at a certain price, and we were to sell them and pay freight and all was over his price we were to take." The distinction between bailment and sale is not difficult of ascertainment, if due regard be had to the elements peculiar to each In bailment, the identical thing delivered is to be restored or the proceeds after sale. In a sale there is an agreement, express or implied, to pay money or its equivalent for the thing delivered, and there is no obligation to return. Has the sender the right to compel a return of the thing sent, or has the receiver the option to pay for the thing in money? *In re Galt,* 56 C. C. A. 473-474; 120 Fed. Rep. 64 *In. re Columbus Buggy Co.,* 74 C. C. A. 613: 143 Fed. Rep. 859. *John Deere Plow Co.* v. *McDavid,* 70 C. C. A. 430; 137 Fed. Rep. 802. Nor do we understand the case of *Curtis* v. *Gibney,* 59 Md. 154, to be in conflict with the above decisions, and we think that a careful reading of the same will disclose their harmony.

Without extending this opinion further for the reasons given the judgment must be affirmed.

> *Judgment affirmed, with costs to the appellee above and below.*