(52 South. 131.)

No. 17,692.

WILLIAM FRANTZ & CO. v. FINK et al.
In re WILLIAM FRANTZ & CO.

(Nov. 2, 1909. On Rehearing, April 11, 1910.)

*(Syllabus by the Court.)*

1. SALES (§§ 205, 235*)—PASSING OF TITLE—"SALE AND RETURN" — DATION EN PAIEMENT.
　　Plaintiff placed in the hands of one Moss certain jewelry with right to sell the same under an obligation to pay them a certain amount fixed at the time. Moss sold to Fink one set of the earrings and received the price. The other set Moss transferred to Fink under "dation en paicment." Frantz & Co. brought this suit to recover and have delivered to them the jewelry, and on default of Fink so to do to recover the price fixed between the parties. The Court of Appeal rendered judgment in favor of the defendant. *Held,* "on review of that judgment," that it was correct as to the jewelry which was "sold" to Fink, but erroneous as to the jewelry which was transferred to him under the "dation en paiement." See Frantz & Co. v. Winehill et al. (recently decided) 124 La. 680, 50 South. 650.

　　[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 559, 681–685; Dec. Dig. §§ 205, 235.*]

*(Additional Syllabus by Editorial Staff.)*

2. SALES (§ 24*)—"SALE AND RETURN."
　　A "sale and return" is a sale with the right of the buyer to return the goods at his option within a reasonable time.

　　[Ed. Note.—For other cases, see Sales, Dec. Dig. § 24.*

　　For other definitions, see Words and Phrases, vol. 7, p. 6307.]

### On Rehearing.

3. SALES (§ 234*)—PASSING OF TITLE—INDICIUM OF OWNERSHIP—POSSESSION.
　　The mere possession of movable property is not such indicium of ownership as will enable the possessor to convey a good title as against the true owner.

　　[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 660, 661; Dec. Dig. § 234.*]

Action by William Frantz & Co. against Jacob Fink and another. Judgment for defendants was affirmed by the Court of Appeal, and plaintiff applies for certiorari or writ of review to the Court of Appeal. Modified and affirmed.

J. Zach Spearing, for applicant. Charles Rosen, for respondents.

NICHOLLS, J. The plaintiff brought suit in the civil district court for the parish of Orleans, in which it alleged that it was the sole and only owner of one pair of solitaire diamond earrings 3½ carats weight, less $1/32$ of a carat, valued at the sum of $502.97, and also another pair of solitaire diamond earrings valued at the sum of $975, making a total of $1,477.97; that on or about the 13th

day of March, 1906, and on or about the 4th day of April, 1906, petitioner delivered the above-mentioned earrings, respectively, to Louis Moss, a resident of New Orleans, for his temporary use, but petitioner did not sell the said earrings nor either of them to the said Moss, nor did petitioner part with the ownership thereof in whole or in part, nor did petitioner authorize the said Moss to sell or dispose of the said earrings in whole or in part or either of them, nor to pledge, pawn, or incumber the same in any manner, shape, or form; that notwithstanding the said Moss had no legal right nor authority to do so, and notwithstanding the sole and only ownership of the said earrings in petitioner, the said Moss in violation of the law and of the right of petitioner did pawn and pledge and deliver all of the said earrings to Jacob Fink, a resident of the city of New Orleans, for a sum of money not known to petitioner, which said sum of money the said Moss used for his own benefit, and the same did not in any manner inure to the benefit or advantage of petitioner; that petitioner is still the sole and only owner of all of the said earrings, and was entitled to be recognized as such and to have the said Jacob Fink condemned to deliver the said earrings to petitioner, or in default thereof to pay the value of the same to petitioner.

In view of the premises, petitioner prayed that Louis Moss and Jacob Fink be duly cited; that after due and proper proceedings there be judgment in favor of petitioner and against the said Moss and the said Fink, recognizing petitioner as the sole and only owner of one pair of diamond earrings 3½ carats in weight less $1/_{32}$ of a carat, valued at the sum of $502.97, and of one pair of solitaire diamond earrings valued at the sum of $975; that they and each of them be ordered and condemned to deliver the said earrings to petitioner within a time to be fixed by this honorable court, or, in default thereof, that there

be judgment in favor of petitioner and against the said Moss and Fink in solido for the full and true sum of $1,477.97, or so much thereof as represents the value of such earrings as may not be delivered to petitioner with legal interest from April 4, 1906, until paid, and costs of court and for all equitable and general relief.

Defendant pleaded a general denial. Further answering, it averred that Louis Moss was a vendor of diamonds and jewelry in the open market of this city, and was well recognized as such by the trade generally and by plaintiff and defendant; that said Louis Moss, being indebted unto defendant in the sum of $500, did in the course of his business dealings, in order to make a settlement of the said $500, on or about April 28, 1906, sell to defendant a certain pair of solitaire diamond earrings for the sum of $965, represented by said debt of $500, which was thereby extinguished, and the further sum of $465 paid by defendant to Harry Koritzky of this city for account of said Moss; that said Moss did in the course of his business dealings, on or about March 14, 1906, sell to defendant another pair of solitaire diamond earrings for the price and sum of $300, which defendant paid to said Moss. And defendant denied that the earrings thus purchased and acquired by him were the property of plaintiff, and defendant averred that he purchased the same and paid for the same in good faith and in open market the full value thereof, and purchased the same from one who was dealer in such articles and recognized by the trade generally and by plaintiff and defendant as such.

Defendant further averred that, so far as defendant was aware, said Moss was the owner of said property and had full power, right, and authority to sell the same to defendant, for which defendant paid the full value in good faith and in open market. Defendant further averred that if he be mistaken, and if it be true that said Moss was not the own-

er of said property, and if it be true that the same was placed in his possession by the said plaintiff, then defendant averred that the same was placed in the possession of said Moss by plaintiff for the purpose of sale, and they are estopped to question the authority of said Moss to sell and dispose of same; and, if there were any litigation on the right of said Moss to sell and dispose of the property, defendant averred that he had no knowledge and no means of knowing thereof, and that he should be protected in the purchase made by him as aforesaid.

In view of the premises, defendant prayed for judgment in his favor rejecting the demand of plaintiff for costs and for full general and equitable relief.

On trial of the suit judgment was rendered in favor of the defendant, and thereupon plaintiff appealed therefrom to the Court of Appeal. That court on hearing of the appeal rendered the following judgment:

"The basis for plaintiff's right to be adjudged the owner of the two diamond earrings and in default of their return to have judgment for the price of said earrings against Fink, who, it may be stated at once, is shown by the evidence to have acquired same in perfect good faith, from a regular and well-known dealer, in open market and for a valuable consideration," is that the earrings were delivered to Moss simply for "temporary use," and absolutely without any authority conferred on him to sell, dispose of, or in any manner to incumber the same.

The testimony of the plaintiff's own witnesses establishes the very contrary:

The earrings were delivered by plaintiff to Moss, who was a dealer in diamonds, known as such to the trade generally and to plaintiff firm particularly, as repeated transactions of a character similar to the transaction in the instant cause were had between plaintiff and Moss, just in the same manner and for the same purpose, and under the same conditions as the plaintiff delivered other jewelry to Moss on actions prior to and subsequent to the instant transaction, and that was the purpose of sale. From the evidence of plaintiff's principal witness, the senior member of the firm, it is apparent that Moss not only had the right to sell these particular goods, but that he obtained them from the plaintiff firm with the knowledge on its part that this was the very purpose of the delivery. He was charged a fixed price for them less than the retail, so that when he sold them a margin of profit could be left to him. The agreement in this and all other similar transactions between Moss and the plaintiff firm was that the former was to have the right either to retain the goods and pay the price agreed on, or to return the goods if he so desired. In his testimony, William Frantz, the senior member of plaintiff's firm, states just how this transaction occurred:

"Q. Will you kindly tell the court the circumstances under which you handed these things over to Mr. Moss, and for which purpose you handed them over to him?

"A. Well, Mr. Moss came into the store, and he told us that he had a customer for a pair of diamond earrings, and so he took them from us for sale.

"Q. Did you sell these diamond earrings to Mr. Moss?

"A. No, sir; we did not sell them to him.

"Q. Well, just tell us what was to be done with them; tell us the whole story with regards to that pair of diamond earrings.

"A. Well, they were delivered to Mr. Moss, and he was either to sell them or return us the earrings; he was to give us back the earrings or the money."

Again he was asked:

"Q. What did he (Moss) state to you?

"A. He stated to us that he had a customer for a pair of earrings.

"Q. And for which purpose did you give this pair of diamond earrings to Mr. Moss?

"A. For the purpose of selling them.

"Q. Selling them generally, or for any one particular customer?

"A. Well, he said he had a particular customer for it. He said he had a customer for a pair of diamond earrings, and so we gave them to him. * * * If the earrings were sold, he was going to bring me the price of them (the money), and, if they were not sold, then the earrings were to be returned to us.

"I charged him a margin of profit on them—on both of them. I did that because he wanted to make a profit on them, and so we thought we would make a very small margin to him."

The price agreed on was $502.97 for one pair and $975 for the other pair of the earrings. This the witness says was within 10 or 15 per cent. of the cost, adding:

"This is not the value at which they would have been sold at retail. They would have been sold at retail at more than that. I made a very small price to Mr. Moss at the time because, naturally, he wanted to make something on it himself."

On cross-examination he says:

"Mr. Moss was an operator in diamonds, or a vendor of diamonds, in this city and of jewelry. He was well known among the trade as such. We charged him (Moss) for these goods on a memorandum slip. He was either to return the goods or to give up the price which we had charged against him. We gave him a bill at the time showing the price that he was to be accountable for to us. He was not to sell the goods and charge us a commission for selling them. He was not to account to us for what he might get out of the goods. Anything that he got for the goods, no matter how much it was above the price which we billed, would belong to him.

"Q. And, whether he sold the goods or kept and retained them himself, all that you wanted to get back from him was the amount that you had charged him for these goods, isn't that right, Mr. Frantz?

"A. Yes, sir; that is correct."

He testified that the plaintiff firm had other similar dealings with Moss.

"In these instances he had always paid us the price that we charged him for the goods. We never inquired as to what he had done with the goods, because we had nothing to do with that—what he sold them for."

From the record of the suit No. 4,594 of our docket, instituted by the plaintiff against J. W. Winehill and Louis Moss, this day decided (124 La. 680, 50 South. 650), we hear that plaintiff firm had similar transactions with Moss, one on the 28th of March, and another on the 2d of April, 1906, concerning diamond studs.

This suit is for the exact price charged Moss, which is less than the actual retail value of these articles.

It is evident from the facts above recited that the transactions beween plaintiff and Moss concerning the earrings in question evidences a contract of sale subject to the right to recover and return reserved to the purchaser, or what is known to the law as a contract of "sale or return."

Article 2439 of the Civil Code defines the contract of sale as "an agreement by which one gives a thing for a price in money and the other gives the price in order to have the thing," and also provides that:

"Three circumstances concur to the perfection of the contract, to wit, the thing sold, the price, and the consent."

Here all these elements concur. Both parties had consented to the transaction—the price was fixed and binding on both, and the thing was delivered.

The only reservation which was a condition subsequent was that Moss had the right of dissolving the sale by a return of the goods to be made within a reasonable delay after the transaction; no specific time being stipulated.

As we have said, this was a transaction of "sale and return." Under such transactions, the title passes to the vendee.

Mr. Benjamin, in his work on Sales (597), says:

"The bargain called 'sale and return' was explained by the Queens Bench in Moss v. Sweet, 16 Q. B. 493 (167)—see Swain v. Shepperd, M. & R. 223—to mean a sale with the right on the part of the buyer to return the goods at his option, within a reasonable time, and in that case it was held that the property passes and an action for goods sold and delivered will lie if the goods are not returned to the seller within a reasonable time.

"In that case Lord Chief Justice James said where a party receives goods to sell them at any price he thought fit, and was still only liable to pay for them at a price fixed beforehand without any reference to the price at which he had sold them in a particular month, he was not acting in a fiduciary capacity in respect to these goods.

"Millish, L. J., was of the same opinion, and, after stating that Neville purchased at a fixed price and at a fixed time, said: 'Now, if it had been his duty to sell to his customers at that price payable at that time, the course of dealing would have been consistent with it being merely a del credere agent, because I apprehend that a del credere agent, like any other agent, is to sell according to the instructions of

his principal and to make such a contract as he is authorized to make for his principal,, and he is distinguished from other agents simply in this, that he guaranteed that these persons to whom he sells shall perform the contract which he makes with them, and therefore, if he sells at the price and upon the credit authorized by his principal, and the customer pays according to his contract, then no doubt he is bound like other agents as soon as he receives the money to hand over to his principal. But if the consignee is at liberty to sell at any price he likes, and receives payment at any time he likes, but is to be bound if he sells the goods to pay the consignee for them at a fixed price and at a fixed time. in my opinion, whatever the parties may think, their relation is not that of principal and agent in point of law, the alleged agent in such a case is making on his own account a purchase from his alleged principal and is again reselling.'" Benjamin on Sales, p. 597.

Mechem on Sales, after referring to sales of goods to arrive to be shipped on approval satisfactory to buyer, if satisfactory to this party, to be weighed, to be appraised, etc., in which cases he says the title does not pass to the seller, reads:

"That to be distinguished from the cases in the last sections are those in which the option is the opposite, i. e,. that the article is purchased and shall be paid for unless it be returned. Here is a present sale subject to a condition subsequent. As is said in one case, an option to purchase if he likes is essentially different from an option to. return a purchase, if he should not like. In one case, the title will not pass until the option is determined; in the other, the property passes at once subject to the right to rescind and return.

"A contract of this nature is a present sale subject to be defeated by a condition subsequent until returned. Therefore the title is in the vendee. He may sell the goods as his own, and thus defeat the return; or they may be seized by his creditors with like effect. The risk usually is his also, as the risk follows the title excepting, perhaps, such risks as, where in the very nature of the property, are incident." Page 677.

Delivery of an article at a fixed price under alternative agreement that the article is to be paid for or returned at the option of the party receiving it constitutes a sale. Crooker v. Gillifer, 44 Me. 491, 69 Am. Dec. 118.

When the option is with the party receiving to pay for or return the goods received,

the uniform current of authority is that such alternative agreement is a sale. Holbrook v. Armstrong, 10 Me. 31.

In Dearborn v. Turner, 16 Me. 17, 33 Am. Dec. 630, it was held that Nason, who received the property having the alternative to return or pay, the property passed to him, and he was at liberty to sell.

In Baswell v. Bicknell, 17 Me. 344, 35 Am. Dec. 262, the party receiving the article in dispute verbally agreed to pay a certain price or return the same in a given time. "The property," said the court, "in the thing delivered passes, and the remedy of the former owner rests in contract. It is the option conceded to the party receiving which produces this effect."

2. Even should the nature of the transaction between plaintiff and Moss be not that of vendor and vendee, there is one fact which stands out conspicuous in the record, indeed, it is admitted by the plaintiff firm, and that is that the goods were delivered by it to Moss for the very purpose of resale. This fact alone would as a matter of law preclude recovery from a bona fide purchaser.

"The general rule permitting the conditional vendor, as for instance in cases where the seller retains the title in the goods until the price is paid, to recover against a bona fide purchaser from the latter, very obviously should not and does not apply in these cases in which the goods have been delivered to the conditional vendee for the very purpose of being resold." Mechem on Sales, p. 601.

"Merely intrusting goods to another, without knowledge that they were to be kept on sale, would not raise an estoppel; but knowledge that they are to be put on sale and acquiescence in allowing them to be so exposed is equivalent to authority to sell them and may well raise an equitable estoppel. That is a matter of law and a defense now favored both at law and in equity." Lewenberg v. Hays, 91 Me. 104, 39 Atl. 469, 64 Am. St. Rep. 215.

And it has been repeatedly held that a pledge of the person thus authorized to sell the goods may claim protection as a bona fide purchaser to the extent of his lien. Western Union, etc., Co. v. Bank, 176 Ill. 260, 52 N. E. 30; Michigan, etc., Co. v. Phil-

lips, 60 Ill. 190; Prall v. Tilt, 27 N. J. Eq. 393; Williams v. Birch, 6 Bosw. (N. Y.) 309; Levy v. Carr, 85 Hun, 289, 32 N. Y. Supp. 1023; Parker v. Baxter, 19 Hun, 40; Mechem on Sales, p. 977.

And so any one who in the ordinary course of business makes advances. 24 A. & E. Enc. 575; 8 A. & E. Enc. 840.

The case of Lallande v. Creditor, 42 La. Ann. 705, 7 South. 895, does not militate against this proposition, forasmuch as the factor in that case to whom the goods were shipped was authorized to sell only as the agent and representative of the client and for the latter. His relation to the latter was of a fiduciary nature, and therefore the goods were not sent to him under a conditional or any character of sale at all. He was not authorized to sell the goods as his own.

In the cases cited supra the goods were delivered under conditional sales, with authority, however, to resell the same for the account and as the property of the person to whom they were delivered. No fiduciary relations existed there, and none exists in the case at bar. A leading case in which it is held that the general rule permitting the conditional vendor to recover against a bona fide purchaser from the latter does not apply where the goods have been delivered to the conditional vendor for the very purpose of being resold in Smith v. Clews, 105 N. Y. 283, 11 N. E. 632, 59 Am. Rep. 502.

The opinion in that case was delivered by Peckham, J., who subsequently became an associate justice of the Supreme Court of the United States. The facts in that case are on "all fours" with the facts of the instant case. The plaintiff there had delivered to one Miers a pair of diamond earrings, which the latter said he had a customer to whom he would sell it, and for which he gave the following receipt to the plaintiff:

"New York, April 12, 1879. Received from Alfred H. Smith & Co. by their representative, B. W. W. Plumb, a pair of single-stone diamond earrings 10⅛ carats of the value of $1,400, on approval to show to my customers, said knobs to be returned to A. H. Smith & Co. on demand. [Signed] E. Miers."

Miers sold the earrings to Clews, and the plaintiff, not being paid for them by Miers, sued Clews to be declared the owner of the earrings and in default of their return for judgment for their value. In the course of the opinion, the court said:

"Having thus become possessed of the diamonds, Miers, as has been stated, sold them to defendant, and the question is: Did he get a good title as against plaintiff?

"Taking the undisputed evidence, and reading this receipt in the light thereof, we cannot resist the conclusion that the plaintiff conferred upon Miers the power to sell the diamonds and, of course, to give a good title, and therefore the court should have directed a verdict for defendant. The plaintiffs were dealers in diamonds, and they knew Miers, and that he was engaged in the business of diamond dealer, a seller of the stones 'to whomsoever he chose.' They had on former occasions intrusted through their agent diamonds to Miers, who had sold and accounted for the proceeds of the sale without any fault being found so far as appears on account of lack of authority to sell.

"They were informed by Miers on this particular occasion that he had a customer for a pair of diamond earrings, and these diamonds were then intrusted to Miers by the plaintiffs through their agent, Plumb. Upon taking them Plumb got the receipt spoken of. Now, upon these facts, what other meaning can be attached to that receipt than that Miers had power to take these diamonds, show them to his customer, and, if approved by the customer, sell them to him? The fact that Miers agreed to return them to plaintiff on demand must be construed with reference to the obvious purpose for which the diamonds were intrusted to him, viz., that of a sale, and, so construed, the plain meaning is that, if not already sold, the plaintiff had the right to demand a return of the diamonds, and Miers would then be bound to return them. The information given to plaintiff by Miers that he (Miers) had a customer for a pair of diamond ear knobs is susceptible of no other interpretation than that he had a customer who wanted to buy a pair.

"Under such circumstances, what could a dealer in diamonds mean by intrusting them to another dealer who had a customer who wanted to buy them, and who came to this dealer for the purpose of being supplied by him with the diamonds of a kind which his customer wanted to buy? Enlightened by these facts, the interpretation of the receipt signed by Miers is an easy matter. It can mean nothing else than an authority to sell the stones to the customer

if they met his approval, and, if not actually sold before demand, they should be returned to the plaintiff upon demand.

"This conclusion as to what was the actual authority given to Miers does not in the least affect the propriety of the decision cited by the counsel for the respondents and in the opinion of the court at general term to the effect that one intrusted simply with the possession of personal property with no power to sell or pass title cannot give title to the property given to a bona fide purchaser for value. The question here is simply what was the authority with which the man Miers was clothed, and upon the undisputed evidence in the case we hold he was an authority to sell."

We have discussed this latter view of the case simply to show that, even if the transaction between plaintiff and Moss be not regarded as a contract of sale, the plaintiff even then could not recover.

We base our decision, however, on the settled conviction that the transaction evidences a perfect sale with a condition subsequent reserved to the vendee only, to rescind the sale and return the goods, and that under such contract the title to the goods passed to Moss.

For this reason the judgment appealed from is "affirmed." The case is before us for a review of that judgment under an order granting the same by this court.

An examination of the testimony in the record as to the relations between Moss and Fink, and the circumstances under which the latter acquired (as he declares) ownership of the articles involved in this suit, shows that Moss made to the defendant Fink a straight sale of the pair of solitaire diamond earrings described in the petition as being valued at $502.97 for the sum of $300, and that he paid the price thereof, and the same were delivered to him. That the second pair of solitaire diamond earrings described in plaintiff's petition and valued at the sum of $975 was transferred by Moss to Fink in payment of a debt due by the former to Fink of $962, which debt owed its origin to the following state of facts:

The plaintiff had delivered to Moss (who was a maker and repairer of, as well as a

vendor of, diamonds) a number of loose stones to be made into a pin. Moss made the pin, but, instead of delivering it to Fink, pledged it to a man named Keil for a loan of $500. Being pressed by Fink to deliver the pin to him, Moss acknowledged that he had pawned it to Keil for the amount stated. Fink called upon Keil and redeemed the pin from the pledge, paying Keil the $500 for which it was pawned. He then demanded payment of the $500 so paid by him from Moss. The latter told him that he had some jewelry pledged to a pawnbroker by the name of Koritzky for a loan of $462; that it was worth $975. He proposed to Fink that he should redeem it from Koritzky, and when so redeemed he (Moss) would give it to him "in payment" of the $500 which had been paid to Keil and the $462 paid to Koritzky.

The proposition was accepted. The amount due Koritzky was paid him, and the earrings under the agreement to Fink were delivered to him through a dation en paiement. The pair at the time of the trial was still in Fink's possession. The jewelry so given in payment were the earrings referred to in Fink's possession.

This court holds, under the state of facts so shown, that title passed to Fink to the first-mentioned pair of earrings, and the judgment of the district court and the Court of Appeal to that effect should be affirmed.

It holds, however, that the said judgments are erroneous in so far as they recognized and decreed the defendant Fink to be the owner of the second pair of solitaire diamond earrings referred to in plaintiff's petition, and that the said judgments in that respect (under the recently decided case of William Frantz & Co. v. Winehill et al., 124 La. 680, 50 South. 650) should be annulled, avoided, and reversed, and judgment rendered in favor of the plaintiffs as prayed for by them for the recovery of said second pair of solitaire diamond earrings or the value thereof.

For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment of the Court of Appeal herein brought up for review and the judgment of the district court (which the Court of Appeal in its said judgment brought up for review affirmed), in so far as said judgments *recognized and decreed the defendant Jacob Fink to be the owner of the said second pair of earrings* described in plaintiffs' petition and rejected the prayer of plaintiffs' petition in respect to the same, be, and the same are hereby, annulled, avoided, and reversed, and it is now recognized, ordered, adjudged, and decreed that the plaintiffs William Frantz & Co. are the owners of the said second pair of solitaire earrings described in plaintiffs' petition and valued at the sum of $975; that said pair of diamond earrings are in the illegal possession of Jacob Fink. It is further ordered, adjudged, and decreed that the defendant Jacob Fink do within 10 days from the date of this judgment deliver the said pair of solitaire diamond earrings to the plaintiffs William Frantz & Co., and, in default thereof, it is ordered, adjudged, and decreed that there be judgment in favor of the plaintiffs and against the said Jacob Fink for the sum of $975, with legal interest thereon from judicial demand until paid.

It is further ordered and decreed that the defendant Jacob Fink pay the costs in the district court, the Court of Appeal, and this court. Except as herein altered, the judgment of the district court and that of the Court of Appeal is hereby affirmed.

## On Rehearing.

PROVOSTY, J. Moss, one of the defendants, was a maker and repairer of jewelry. He had an office on the second floor of a building on one of the principal streets of this city, and also a workshop on the third floor of the same building. What this office consisted of, or what he kept in it, the record does not show. In a small way he bought and sold diamonds. The defendant Fink, in answer to the question, "Q. He didn't have any store?" answered, "He used to carry around a little paper of loose goods all the time; yes, sir." From this, and from the evidence generally in the case, we understand that Moss was more of an artisan—a maker and repairer of jewelry and diamond setter—than merchant; and that he traded only in a small way in jewelry. That he did this, however, was well known among the trade.

The plaintiff firm has a large jewelry establishment in this city. It had had some dealings with Moss in a small way, had sold him "some small things," for which he had duly paid, when the transactions which have given rise to the present controversy took place.

On March 16, 1906, he came into the store of the plaintiff firm, and said he had a customer for a pair of diamond earrings, and asked plaintiff to let him have the goods to show to his customer; and again, on April 4, 1906, he came with another similar request for another pair of diamond earrings; and *both times plaintiff complied with his request.*

A material point in the case is as to what were the terms and conditions on which the two pairs of earrings were thus put in the possession of Moss. The only witness on that point is the senior member of the plaintiff firm, and his testimony is accepted as true. He says that he fixed a price on the earrings, and let Moss have them on the condition that he should either return them or pay the price; that he did not sell them to him, but fixed the price low enough for him to make a profit in selling them to some one else. On both occasions the witness put this price on a piece of paper, and handed it to Moss, and made a memorandum for himself of what goods he had thus intrusted, and of the price set on them. This price was $502 on the first pair, and $975 on the second.

No time seems to have been fixed within which Moss should return the goods or pay for them, and the evidence does not show what was contemplated in that regard. It does show, however, that plaintiffs made inquiries of Moss, and were told that his customers were still deliberating.

As a matter of fact, he had taken the first pair of earrings on the day after he got them to the pawnbroker's shop of the defendant Fink and sold them to him for $300. This was $202 less than the low price set upon them by plaintiff.

The second pair of earrings he pledged at the pawnbroker's shop of one Koritzky for $465. The date of this pledge is not shown.

In the early part of February the defendant Fink had bought some small loose diamonds of Moss, and had left in his hands 171 small diamonds to be set in a pin or brooch. While the work was in progress, Fink kept an eye on his 171 diamonds. In one place he says that he went to Moss' shop every day; at another place he says that he went once or twice a week. After the pin had been apparently completed, Moss would not give it up, saying there was still something to be done to it. He had already been paid the price agreed on for doing the work, $110. The pin was worth $1,500. Fink had called at Moss' shop on several consecutive days to demand the pin and not found him in, when, determined to have the pin, he sought him out at his house; and Moss then acknowledged that he had pledged the pin at the shop of one Keil for $500. He at the same time said that he owned a pair of diamond earrings worth $975, which he had pledged to Koritzky for $465, and that Fink could have them if he would redeem them and pay the $500 to Keil in redemption of the pin. This Fink agreed to do, and on the same day did do.

On the evening of that day, April 28th, a Saturday, Moss came to plaintiff with a story that two armed men had come to his shop and robbed him of the diamonds. Plaintiff did not believe him and had him arrested, and at once instituted, with the aid of detectives, a search among the pawnbrokers' shops of the city. On the first visit to the shop of the defendant Fink he denied that he had had any dealings with Moss. When Moss saw that his tale of robbery would not hold, he confessed; and Fink also, on the second visit to his shop, acknowledged his transactions with Moss, and offered to restore the goods on being reimbursed the several sums which he had paid out, namely, the $300 to Moss, the $465 to Koritzky, and the $500 to Keil.

Plaintiff then brought this suit against Fink and Moss, demanding in the alternative a return of the goods or payment of the price set upon them.

Moss made no defense. Fink contends that the transactions between Moss and the plaintiff were sales; that Moss became owner of the goods, and could convey a valid title to them; that, at all events, the plaintiff firm is estopped in the premises, because it clothed Moss with the indicia of ownership, thereby enabling him to commit the fraud; and that, whenever one of two innocent persons must suffer by the acts of a third, he who enables such person to occasion the loss must sustain it.

The question of whether Moss became the owner of the goods or not depends upon what was the agreement of the parties. The parties had a perfect right to make any agreement they chose in that regard. The rights conferred upon Moss by that agreement were: (1) To become owner of the goods on paying the price set upon them; (2) to sell the goods to some one else at a cash price of not less than that set upon them. The right was not conferred upon him to buy the goods on a credit; or, in other words, to become debtor to plaintiff for the price of the goods. What-

ever money he received from the person he sold the goods to was to be plaintiff's money; and, if he failed to account for it, he would be criminally responsible. The goods were not sold to him, and the only way in which he could become the owner of them was by paying cash for them. By the terms of the arrangement Moss could not sell the goods on a credit. Either the goods or the money would have to be in his hands, to be delivered to plaintiff.

The goods not having been sold to Moss, he could transfer no title to them. Nemo plus in alium transferre potest quam ipse habet. 5 Cyc. 207; 24 A. & E. E. 1163.

The learned counsel for the defendant Fink contend that the transaction was of the kind known at common law as "sale and return," and the Court of Appeal took that view. We repeat, the nature of a transaction is what the parties agree that it should be; and the distinct agreement in this case was that the goods were not sold, or agreed to be sold, on a credit to Moss, but that the only way he could become the owner of them was by paying cash for them. For the distinction between such an agreement and what is commonly known as "sale and return," see Sturm v. Boker, 150 U. S. 323, 14 Sup. Ct. 99, 37 L. Ed. 1099, and note; Sturtevant v. Dugan, 106 Md. 587, 68 Atl. 351, 14 Am. & Eng. Ann. Cas. 679.

Before passing to the consideration of how far plaintiff may be estopped, we will note that the law of agency can play no part in this case. Moss had no mandate to sell the goods at less than the price set upon them, and still less had he any mandate to give them in payment of his debts. And Fink did not deal with him as the agent of the plaintiff firm, but as the owner of the goods.

Coming to a consideration to the estoppel, it is a plain proposition that the mere possession of movable property is not such indicium of ownership as will enable the possessor to convey a good title as against the true owner. If it did, the borrower or hirer of a horse could validly sell it. The owner must have done something more than merely confide the possession of his property to the possessor before the latter can sell it or create a lien upon it. He must have to some extent accredited the title of the possessor— clothed him with more pronounced indicium of ownership than mere possession.

This may be done in various ways, and one way would be what the plaintiff firm did in this case, namely, consent that a vender of jewelry exhibit the jewels as part of his stock of goods, or as belonging to him.

"If a wine merchant be left in possession of wine, the fair inference is that it is his own, and a person may be justified in advancing money upon the security of it." Per Bramwell, L. J., in Meggy v. Imperial, 3 Q. B. D., 717.

The decision in Conner v. Hill, 6 La. Ann. 7, is founded upon estoppel, agency, and ratification. From the facts as stated, the grounds of estoppel do not appear; but the writer of the present opinion knows that the flatboats coming down the Mississippi river before the War loaded with western produce were for sale, and that usually, if not always, those in charge of them had authority to sell; so that Anderson, who was in charge of the flatboat in that case, had more than mere possession. He had a possession which, according to custom, was accompanied by the power to sell. True, the owner had not consented to his being thus clothed with apparent authority to sell, but his son and agent had done so for him. It was upon this the court must have founded the estoppel, in so far as the decision is based on estoppel.

True, Moss was more of an artisan than merchant; but it was in his character of merchant that both plaintiff and Fink dealt with him. Plaintiff consented that he should exhibit the earrings to his customers as belonging to him, and that he should do so

in his quality of a trader in jewelry. Fink, knowing him to be a trader in jewels, was justified in buying from him. It follows from this that Fink acquired a good title to the first pair of earrings. Although, we must say, that the great disparity in price gives some room for suspicion even as to that pair of earrings.

With respect to the second pair, Fink is not in a position to invoke equitable estoppel. For him to be in a position to do so, it would be necessary that he should "not only have been destitute of knowledge of the real facts, but should also have been without convenient or ready means of acquiring such knowledge." 16 Cyc. 739. And he must have been led to change his position for the worse. 16 Cyc. 722.

"Notice is to be distinguished from knowledge, and, if the buyer has notice of facts which would put a reasonably prudent man upon inquiry which would have resulted in the ascertainment of the adverse interest sought to be enforced against him, he will be deemed to have taken with notice, and cannot assert the rights of a bona fide purchaser." 26 A. & E. E. 1175.

In so far as the earrings were taken in reimbursement of the $500 which Fink had to pay to Keil for redeeming his pin, his position was not changed for the worse, since that amount would have had to be paid to Keil even if Moss had never had possession of the earrings, and since it is not pretended that he was deprived of any recourse which he would otherwise have had against Moss. As to the circumstances under which one who has received property in payment of an antecedent debt may be considered to have parted with value, see 26 A. & E. E. 1171; 1173.

By the time Fink came to deal with Moss for this second pair of earrings, Moss had become utterly discredited. He was a confessed embezzler. He was no longer a merchant or trader having valuable goods for sale, but was a diamond setter who had pledged the goods of his employer and stood under the necessity of confessing his crime because of his inability to redeem the pledge. He was not a merchant offering to sell goods out of his stock, but at best an ex-merchant who was proposing to the person whose property he had embezzled that the latter should rescue from the pawnbroker's shop a certain piece of property and pay himself out of the margin between value of the thing and the amount for which it stood pledged. Fink testifies that he had lost confidence in Moss and would not trust him out of his sight with the $465 for redeeming the earrings from Koritzky. The fact itself, well known to Fink, that Moss was a diamond setter, to whom valuable jewelry was likely to be intrusted by third persons, was in itself sufficient to put Fink upon inquiry. We cannot help thinking that Fink was a willing victim, and that, if it had not been for the chance of getting back his $500, he would have dealt with Moss with a good deal less of confidence.

As to this $465, we put our decision distinctly on the fact that the earrings were not acquired from a merchant having them for sale to the public generally, but were redeemed from a pawnbroker's shop at the request of an embezzler as a means of settlement for the embezzlement.

It is therefore ordered, adjudged, and decreed that our former decree be reinstated and made the judgment of this court.