# CHARLESTON.

### J. E. POLING Co. v. HUFFMAN & FROST.

Submitted May 6, 1919.   Decided May 13, 1919.

1. SALES—*Delivery—Necessity—Passing of Title.*
    Delivery of possession is not indispensable to the passing of title to the purchaser, under a contract for the sale of personal property, and the parties may by the terms and provisions of their contract evince an intention to pass title before delivery, in which case their intention governs.   (p. 202).

2. LOGS AND LOGGING—*Sales—Manufactured Timber—Vesting of Title.*
    In a contract for the sale of lumber to be manufactured and stacked by the seller, a stipulation that it shall be at the latter's risk until dried is not inconsistent with the vesting of title in the purchaser as soon as the lumber is stacked, nor does it evince an intention by the seller to retain the title.   (p. 202).

3. SAME—*Purchase of Lumber—Passing of Title—Construction of Contract.*
    Under a contract for the purchase of all the lumber to be manufactured by the seller from a certain tract of land and stacked on the millyard to dry, to be paid for at stated prices per M. feet, depending on the kinds and grades, the terms of payment being $500 cash, and such sums monthly thereafter as will meet the operating expenses of the seller, providing that there shall be enough lumber stacked on the millyard or at the railroad to cover such sums, the terms thereof having been complied with by the purchaser, vests title in him as soon as the lumber is manufactured and stacked.   (p. 203).

Error to Circuit Court, Randolph County.

Action by the J. E. Poling Company against Huffman & Frost.   Judgment for defendant, and plaintiff brings error.
                    *Reversed and new trial granted.*

*Talbott & Hoover,* for plaintiff in error.
*Arnold & Arnold,* for defendant in error.

WILLIAMS, JUDGE:

By this writ of error J. E. Poling Company, plaintiff in error, a corporation, seeks reversal of a judgment rendered on the 8th November, 1917, by the circuit court of Ran-

dolph county in a proceeding to try the right of property, originating in a justice's court and appealed to said circuit court.

H. C. Huffman and J. S. Frost, partners trading as Huffman & Frost, recovered a judgment against P. H. Phares and wife for $135.50 and $4.75 costs on the 24th October, 1914, before A. W. Graham, a justice of the peace, and on the same day and before the same justice, another judgment against P. H. Phares & Company for $14.30 and $5.45 costs. Executions on these judgments were issued on the 26th October, 1914, and placed in the hands of the constable, and on the 4th November, 1914, were returned not satisfied. It does not appear when these actions were instituted, but it appears that an order of attachment was issued by the justice on the 10th day of October, 1914, commanding the constable to attach the personal property of P. H. Phares and Amanda Phares, or so much thereof as will satisfy plaintiffs' demands, amounting to $167.26 with interest from 3rd April, 1914, and costs. The attachment order was issued in a suit styled Huffman and Frost against P. H. Phares and Amanda Phares, and we presume the attachment was based on the same claims for which the two judgments above were later rendered. The attachment was levied on the 12th day of October, 1914, upon "about twelve thousand feet of soft maple, 8 quarter," whereupon J. E. Poling Company filed its petition before the justice, claiming title to the property attached, and Huffman and Frost and Phares and wife were summoned to appear on the 4th November, 1914, to show cause, if any they could, why the property should not be discharged from said levy, and, on a hearing of the question on said date, judgment was rendered in favor of the J. E. Poling Company, releasing the lumber. On the trial of the case, on appeal to the circuit court, that court directed a verdict for defendants, and, when returned accordingly, entered judgment thereon.

Admission as evidence of the two executions, refusal to give its peremptory instruction, the giving of a peremptory instruction for defendants, and overruling its motion to set

aside the verdict; are assigned as error. Plaintiff in error claims title by virtue of a written contract between it and P. H. Phares and G. C. Mullenix executed 26th November, 1912, and, in our view of the case, the right of property, either at the time the attachmment was levied or when the executions were placed in the hands of the officer, depends upon the construction of that contract, rendering unnecessary the consideration of some of the assignments of error.

It is insisted the attachment was void for want of a proper affidavit. We may concede but do not decide this point. But it is hardly necessary to say that, by virtue of the executions, even though returned unsatisfied, Huffman & Frost would acquire a lien on the lumber, if it was then the property of the execution debtor. §2 Ch. 141, Code; and *Birch River Lumber Co.* v. *Glen Boom Lumber Co.*, 71 W. Va. 507. If plaintiff in error had title it vested prior to the issuing of the executions.

Phares and Mullenix were partners engaged in manufacturing lumber and operated a sawmill, and the contract was for the purchase of "all the lumber manufactured and to be manufactured, from the timber on the Patrick H. Phares land in what is known as the Sinks in Randolph county, consisting of about 75,000 feet of spruce, about 75,000 feet of bass wood and about 15,000 feet of ash, about 50,000 feet of cherry and about 200,000 feet of hard maple, at the following prices to be delivered to town of Horton, W. Va. to be delivered on board of cars, that is to say that the parties of the first part pays the freight on the log road of the Parsons Pulp and Lumber Co. down to Horton." A schedule of the prices of lumber of the different kinds, grades and dimensions is then stated and the contract continues as follows: "All lumber of every character and kind manufactured from this date to the completion of this contract to be end trimmed and well manufactured and all lumber to remain on sticks until dry at the risk of the parties of the first part. This contract to be completed by April 1st, 1914, all the lumber mentioned in this contract to be cut and on sticks by April 1st, 1914, and sooner if possible. If more

time is needed to move the timber and cut it, then it must be by special contract. The party of the second part agrees to pay cash on this contract of $500.00 and then on the 20th day of each month hereafter an amount in money and merchandise to pay manufacturing expenses of the party of the first part providing there is lumber on sticks either at mill or railroad to cover same. The parties of the first part do hereby agree to buy all their hay, grain, groceries and all their necessary supplies and other merchandise of the party of the second part.''

Plaintiff in error overpaid Phares and Mullenix for the lumber to the extent of about $1,000, although it admits there had been no final setlement of their accounts. The lumber in question was on sticks at the mill, about six or seven miles from Horton, and counsel for Huffman and Frost, the execution creditors, insist that title thereto had not passed to J. E. Poling Company, that delivery had to be made at Horton before title could pass. But this depends upon the intention of the parties. *Moore* v. *Patchin,* 71 W. Va. 192; *Buskirk Bros.* v. *Peck,* 57 W. Va. 360; Williston on Sales, §18; and 35 Cyc. 277. The contract itself defines what was meant by the terms ''to be delivered at Horton,'' which simply was that the sellers were to pay the freight over the log road to Horton. They were not intended to provide a condition precedent to the vesting of the title in the vendee.

It is also insisted that the provision that the lumber was to remain on sticks until dry ''at the risk'' of Phares and Mullenix indicates a purpose to allow the title to remain in the sellers. This provision was inserted clearly for the benefit of the purchaser, and is not inconsistent with its ownership. The risk may be assumed by either buyer or seller without affecting the ownership. The agreement of the seller to assume it simply operated to make them, for the time being, the insurers for the purchaser. If it had not been so agreed, the loss, if any, would have fallen on the purchaser under the rules of law, and the agreement was made to avoid this consequence. Otherwise, the provision, re-

specting the risk was wholly useless, for there would be no occasion for the sellers to assume a risk which was clearly theirs. So that this circumstance furnishes an argument for rather than against the contention of plaintiff in error, and is perfectly consistent with the interpretation which it puts upon the contract. Williston on Sales, §302; 35 Cyc. 343; *Elgee Cotton Cases*, 22 Wall, 180; and *Martineau* v. *Kitchen*, L. R. 7 Q. B. 436.

The provision requiring a special agreement in order to extend the time for manufacturing the timber beyond the 1st of April, 1914, if not completed before then, was inserted for the mutual benefit of the contracting parties and only they can take advantage of the non-compliance with it, and they are not complaining. Neither Phares nor Mullenix testified in the case. It is proven that the lumber was manufactured from timber on the particular tract of land described in the contract, and it is immaterial, so far as it relates to this controversy, whether it was manufactured before or after the 1st of April, 1914. It was the last lumber manufactured in 1914 from this land, none was cut afterwards. J. S. Frost admits he was about the lumber operations frequently, trying to collect the debt of his firm, and knew that the J. E. Poling Company was getting the lumber sawed at the mill and that it had a contract for it. J. E. Poling, a stockholder and the general manager of the company, swears that his instructions to his agent Cunningham and also to Phares, was to mark the lumber after it was stacked on sticks, as the property of J. E. Poling Company, and that he was at the mill either in August or September, 1914, to see what lumber was there, and marked the particular lumber now the subject of controversy. This testimony is not expressly denied by any witness, and only inferentially denied by J. S. Frost, who says that when they went to levy the attachment they didn't see any marks on the stack of lumber, but he does not say he examined carefully to ascertain whether it had been marked. But this is not material. Viewing the contract in its entirety, it seems clear the parties intended the property to vest in the pur-

chaser when and as the lumber was stacked on the millyard to dry. "All the lumber manufactured and to be manufactured" from a certain piece of land, was purchased, and the terms of payment, which aid materially in construing the contract, were $500 to be paid in cash, and thereafter, on the 20th day of each month, payments to meet the manufacturing expenses, "provided there is lumber on sticks either at the mill or railroad to cover same." The lumber in controversy having been manufactured from the tract of land described in the contract and stacked on the millyard, it was the property of plaintiff in error, and for refusing to so instruct the jury at its request the judgment must be reversed and the cause remanded for a new trial.

*Reversed and new trial granted.*