FRAZEE LUMBER CO.

*v.*

CHARLES H. HADEN, II, *State Tax Commissioner*

(No. 12949)

Submitted February 6, 1973.     Decided April 10, 1973.

Rehearing Denied July 11, 1973.

*Chauncey H. Browning, Jr.,* Attorney General, *Guy R. Bucci,* Assistant Attorney General, for appellant.

*Bonn Brown,* for appellee.

NEELY, JUDGE:

This is an appeal by the State Tax Commissioner from a final order of the Circuit Court of Randolph County entered May 29, 1969 granting taxpayer relief from a business and occupation tax assessment.

On December 29, 1964, the State Tax Commissioner levied a business and occupation tax assessment pursuant to the provisions of Chapter 11, Article 13, Section 2a *Code of West Virginia,* 1931, as amended, against Frazee Lumber Company. Frazee did not report gross income and pay the consequent tax derived from its business activities conducted in West Virginia. Thereafter, the

taxpayer filed a petition for reassessment and was accorded a hearing as prescribed by the *Code.*

After consideration of the evidence, the Tax Commissioner affirmed the assessment of business and occupation tax in the amount of $25,018.93 and a penalty of $8,538.13, for a total liability of $33,557.06.

Pursuant to Chapter 11, Article 13, Section 8, *Code of West Virginia,* 1931, as amended, the taxpayer appealed the Tax Commissioner's decision to the Circuit Court of Randolph County, West Virginia. The Circuit Court affirmed the action of the Tax Commissioner except with regard to the finding of the commissioner that Frazee Lumber Company was engaged in the business activity of producing timber and, therefore, was subject to the business and occupation tax imposed upon the privilege of producing timber. The Circuit Court also held that there be no penalties accruing during the pendency of the appeal before this Court.

The Frazee Lumber Company is a foreign corporation qualified to do business in West Virginia. Frazee, on May 20, 1960, entered into a contract with the Sun Lumber Company, a West Virginia corporation, in which Sun did:

" * * * [G]rant, convey, sell, assign, transfer and forever set over to the Company, with covenants of special warranty [eighteen thousand acres] * * *.

" * * * [O]f the timber and trees which at the time of cutting measure 14 inches and up wide diameter over the bark, breast high (D.B.H.) on the uphill side, standing and fallen * * *."

The agreement provides that Frazee shall pay for all the timber severed at the rate of $27.50 per thousand board feet, measured according to the Doyle Log Scale Rule. Further, Frazee at the time of the execution and delivery of the contract, was required to pay to the Sun Lumber Company the sum of twenty-five thousand dollars ($25,000) as advance payment for nine hundred nine thousand ninety-one (909,091) board feet of timber, and

the agreement provided that before the cutting of the next nine hundred nine thousand ninety-one (909,091) board feet, Frazee was to pay an additional twenty-five thousand dollars ($25,000) and a similar sum for each additional allotment of timber.

The instrument provides that Frazee will purchase the timber from Sun for a certain term of years, and will have the right to cut and remove such timber of certain specifications as long as Frazee's operations meet certain other requirements imposed by Sun Lumber Company with regard to the cutting, hauling, grading, and manufacture of the timber. Sun agreed to discontinue its operations on the property which was subject to the agreement.

The appeal from the State Tax Commissioner's ruling was initially brought in the court of the Honorable Stanley Bosworth, Judge of the Circuit Court of Randolph County. In January, 1969, the Honorable George R. Triplett succeeded to the bench. Thereupon, Judge Triplett reopened the case in order adequately to pass upon the questions of law and fact raised by the proceedings. It is argued by the State Tax Commissioner that the hearing held January 24, 1969 was an *ex parte* hearing in which the State Tax Commissioner was not represented, and that consequently, the order entered on February 14, 1969 pursuant to the hearing is violative of due process. We find no merit in this argument.

The record discloses that Judge Triplett wrote to both counsel informing them of the prospective hearing on January 24, 1969, and that the Attorney General's office received the letter. It further discloses that Judge Triplett talked personally with Mr. Jack M. McCarty of the Attorney General's office and discussed the date for the hearing. It is evident that the Attorney General's office had notice and chose not to attend the hearing.

Judge Triplett held the hearing on January 24, 1969 and received oral testimony of Mr. Robert L. McClintock concerning the procedures employed for operating under

the contract between Sun Lumber and Frazee. It appears from the record that long before the January 24, 1969 hearing, in open court, on September 10, 1968 the attorneys for the Tax Commissioner and for Frazee stipulated that the case would be submitted on briefs to Judge Bosworth and that the briefs would be filed by a certain time. In the stipulation the parties agreed to narrow the issue to the question of whether the contract between Sun and Frazee dated May 20, 1960 made Frazee a purchaser of standing timber, and therefore subject to the business and occupation tax imposed by Chapter 11, Article 13, Section 2a *Code of West Virginia,* 1931, as amended, upon the activity of producing timber at the time such timber was cut, or alternatively whether Frazee was the purchaser of logs which had already been severed, and therefore only subject to the business and occupation tax for subsequent lumber manufacturing processes.

It does not appear in the record that counsel for Frazee ever requested in writing that the Circuit Court hold a hearing, and Judge Triplett's comments demonstrate that the Judge requested further evidence on his own motion in order to assist him in the disposition of the case.

While stipulations made in open court between parties or their counsel are binding upon the parties, *Spencer v. Steinbrecher,* 152 W.Va. 490, 164 S.E.2d 710 (1968), those stipulations are not binding upon the court. The court is entitled to request the presentation of such evidence, and the briefing of such issues of law, as appear to the court necessary for the equitable resolution of a controversy before it. It is generally held that the inherent powers of a court are so broad as to encompass every action "reasonably necessary for the administration of justice within the scope of its jurisdiction." *Shields v. Romine,* 122 W.Va. 639, 13 S.E.2d 16 (1940).

Although the proceedings in this case were regular, this Court finds that the Circuit Court was clearly wrong in both its findings of fact and conclusions of law. In the Court's opinion dated January 24, 1969 the Court found the following facts:

"No. 4. Frazee, again the court reiterates, was in the sawmill business sawing logs into rough lumber and it was certainly not in the timber cutting business and the business of hauling lumber when Sun maintained the control over the contract as it is indicated by the terms thereon. There were independent contractors to cut the timber. There were also independent contractors to haul the logs to Frazee's mill.

"Again 7 — Sun paid all the real estate taxes.

"No. 8. The land and the trees still were assessed to Sun.

"No. 9. It is the Courts opinion that the agreement or deed amounts to a lease.

"No. 10. Sun retained control of the logs until at the mill site when payment from Frazee to Sun was determined by Sun's log Scaler at the Mill by the Doyle Scale."

The only question presented for decision on the merits in this case is whether the contract between Frazee and Sun Lumber was a sale of standing timber, making Frazee the producer of logs and subject to the business and occupation tax on such production, or whether Frazee purchased the logs after they were cut. The contract is apparently a usual contract in the lumber business; however, it has aspects of a lease, sale, and option. The second paragraph reads:

"WITNESSETH, that for and in consideration of the sum of ten dollars ($10.00) and other good and valuable consideration paid and to be paid by the company to Sun, as hereinafter provided, Sun does hereby grant, convey, sell, assign, transfer and forever set over to the Company, with covenants of special warranty, all of the following described properties, to-wit:"

The next paragraph then begins to set out the properties conveyed and reads as follows:

"All of the timber and trees which at the time of cutting measure 14 inches and up wide diameter over the bark, breast high (D.B.H.) on the uphill side, standing and fallen, on all those certain tracts or parcels of land belonging to Sun

and situate in Randolph, Webster, Braxton and Upshur Counties, West Virginia, * * *."

The difficulty in interpretation arises from the terms of the agreement which provide for payment to Sun as each successive nine hundred nine thousand ninety-one (909,091) board feet of timber are cut. Logs are paid for as they are cut so that the total compensation to Sun depends upon the amount of timber which is found in the tracts of land subject to the agreement. The only aspect of this contract which suggests that it purports to sell logs at the mill site rather than standing timber, is the provision which requires that logs are to be scaled at the mill site, and that payment is to be rendered over the minimum twenty-five thousand dollar per quarter payment on the basis of logs actually cut. As long as Frazee continues to operate under the agreement, it must pay Sun at least twenty-five thousand dollars ($25,000) per quarter whether any logs are cut.

However it is evident from the language of the agreement that Frazee is responsible for cutting the timber, and is either to cut the timber itself, or contract it to specialists in the timber cutting business, in conformity with procedures dictated by Sun for the purposes of conservation of the Sun property. Sun had no responsibility to engage in the actual cutting, and Sun was to receive money regardless of whether trees were cut.

Mr. McClintock, Vice President of Frazee, testified in the January 24, 1969 hearing that he had never intended to purchase timber on the stump, and that he was assuring his supply of logs to his Hacker Valley saw mill. However, he admitted that it was Frazee which contracted with and paid the people who actually cut the logs, and that Frazee contracted to have the cut logs hauled to the mill. Mr. McClintock admitted that Frazee owned bulldozers, trucks, and other equipment for the extraction of timber, primarily for the purpose of giving Frazee an in-house capability to cut timber in order to put Frazee in a better negotiating position with respect to the independent contractors who usually cut and hauled the logs.

McClintock further admitted that Frazee had attempted to take tax credit for natural resource depletion on its federal income tax return, but that the Internal Revenue Service, as of the time of the testimony, had not allowed the credit.

The preponderance of the evidence militates in favor of interpreting this contract as a sale of standing timber, or alternatively as a lease of timber rights. The Court notices that the granting clause of the agreement has a covenant of general warranty, which is usually associated with a grant of an interest in real estate. The price is fixed at at least $25,000 per quarter, but may be accelerated if more than $25,000 worth of timber is cut in any one quarter. The initial period covered by the contract is a term of ten years; however, Frazee has an option to remain upon the land for an additional five years for the purpose of cutting timber upon the payment of an additional $20,000 for each year in excess of ten years that it chooses to occupy the land.

The contract requires Frazee to cut all logs which are eight inches or more in diameter over the bark at the small end and at least eight feet in length, and from which log length lumber can be obtained. Sun evidently wanted to assure that they would be paid for all of the timber on the leased premises, and that Frazee would not limit itself to cutting exclusively high-grade timber.

One clue to the intention of the parties with reference to the tax consequences of this eclectic contract is found in paragraphs 18 and 30 of the instrument which read as follows:

> "No. 18. The Company agrees that during the term hereof it will pay all taxes lawfully assessed upon or against the properties herein conveyed and any and all improvements made or placed thereon by it, and in the event said properties herein conveyed or any improvements hereafter placed thereon are not separately assessed in the name of the Company, then Sun may pay such taxes when due and the Company shall promptly reimburse Sun for its equitable proportion of such

taxes. The taxes for the year 1960 upon the properties hereby conveyed shall be equitably apportioned between Sun and the Company. All severance taxes and similar taxes and all excise or other taxes on the production of lumber or timber products shall be paid by the Company.

"No. 30. Sun shall execute and deliver such further assurances from time to time as may be requisite to vest in the Company full and complete title to the timber and properties hereby conveyed or intended to be conveyed."

It is true that Sun paid the real estate taxes attributable to all the tracts which are within the agreement; however, this fact is not inconsistent with a conclusion that the agreement is a lease of timber rights, or alternatively a sale of standing timber. The agreement clearly indicates that Frazee is obligated to cut and pay for all the timber of marketable quality on the tract. McClintock's testimony that Frazee could terminate its operation at any time by paying a small penalty is obviously inconsistent with the plain meaning of the agreement.

In view of all these facts, we hold that the Tax Commissioner was justified in treating Frazee as the owner of the standing timber and the producer of the logs. This suit is between Frazee and the Tax Commissioner and precedents which would be relevant in determining rights to the timber between Sun and Frazee or their successors and assigns would only cloud the issues of this case as it was the evident intent of the agreement that Frazee pay the taxes. As is so often necessary in tax cases, the Court points out that the precedent value of this case is limited to tax questions and does not affect previous decisions involving property rights.

The imposition of the business and occupation tax for the production of timber is governed by Section 11-13-2a of the *Code*. That section says:

"Upon every person * * * engaging or continuing within this State in the business of * * * producing for sale, profit or commercial use any natural resource products, the amount of such tax

to be equal to the value of the articles produced as shown by the gross proceeds derived from the sale thereof by the producer, except as otherwise provided, multiplied by the respective rates as follows: . . . . The measure of this tax is the value of the entire production in this State, regardless of the place of sale or the fact that the delivery may be made to points outside the State."

The clear language of this section imposes a tax upon every person engaging in the business of producing timber for sale, profit or commercial use. It does not appear that the *Code* section reaches the issue of the ownership of trees, but rather taxes the act of production.

In the landmark case of *United Fuel Gas Co. v. Battle*, 153 W.Va. 222, 167 S.E.2d 890 (1969) Judge Haymond made short work of obfuscating assertions concerning ownership in a tax case involving production. In that case United Fuel contended that free gas which it rendered to its lessor as part of its royalty for production was not included in the measure of gas produced for the purposes of the tax levied under *Code* 11-13-2a. United Fuel asserted that it did not own the gas and therefore could not be taxed. Judge Haymond wrote at p. 232 of the West Virginia Report:

" * * * [T]he question of the ownership of the gas when it is discovered and extracted, despite the argument of the plaintiff in support of the ownership by the lessor instead of the lessee of the unmetered and unmeasured free gas, is not important or controlling. Regardless of the ownership of such gas it is clear that all free gas involved in this proceeding is produced by the plaintiff as lessee in its various leases. It is the production of gas, not its ownership, which is subjected to taxation under Section 2a."

The facts in this case clearly indicate that Frazee was producing timber within the meaning of Section 11-13-2a of the *Code*. Frazee had the responsibility for contracting for the removal of the timber; Frazee owned bulldozers,

trucks and other equipment so that it could cut the timber itself; and, Frazee paid a fixed amount every quarter for the privilege of being able to cut trees on Sun's property regardless of whether they actually cut any.

Timbering contracts similar to the one between Frazee and Sun have been construed for a number of purposes in previous West Virginia decisions. See *Buskirk Brothers v. Peck,* 57 W.Va. 360, 50 S.E. 432 (1905); *Hardman v. Brown,* 77 W.Va. 478, 88 S.E. 1016 (1916); *Furrow v. Bair,* 84 W.Va. 654, 100 S.E. 506 (1919). While these cases demonstrate that the contract under consideration is an ordinary contract for the lumber business, these decisions resolved disputes between the parties to the contract and not disputes with the State Tax Commissioner. The technical question of ownership of the trees immediately before they were severed from the stump is a matter of indifference to the State Tax Commissioner where it is evident that Frazee was responsible for the action of severing, and from a physical production point of view, was the entity responsible for "producing" the timber.

The Tax Commissioner's determination that Frazee is responsible for the business and occupation taxes is strengthened by paragraphs 18 and 30 of the argreement, quoted *supra,* in which Frazee is made liable for the payment of all taxes and Sun agrees to execute further assurances to "vest title" to the timber. Evidently it was the intention of the parties that the agreement pass such rights of ownership and responsibilities for the actual cutting of the timber as to make Frazee liable for the business and occupation taxes.

Accordingly we reverse the Circuit Court of Randolph County with respect to that part of its orders of February 14, 1969 and May 29, 1969 adjudging that Frazee Lumber Company is not liable for the payment of business and occupation taxes on the production of timber as assessed by the State Tax Commissioner December 29, 1964, and remand this case to the Circuit Court for the entry of an order consistent with this opinion.

Judge Haden, deeming himself disqualified, did not participate in the consideration and decision of this case.

*Reversed and remanded with directions.*