352 S.E.2d 541

**H.O. ANDERSON, INC.**

v.

**Herschel H. ROSE III, as Tax Commissioner, etc.**

No. 16809.

Supreme Court of Appeals of West Virginia.

Decided Dec. 12, 1986.

Dissenting Opinion Jan. 9, 1987.

**420**

Charlie Brown, Atty. Gen., Charleston, Gregory A. Morgan, Asst. Atty. Gen., Clarksburg, for appellants.

David Layva, Avey & Steptoe, Charles Town, for appellee.

McGRAW, Justice:

This is an appeal by the Tax Commissioner of West Virginia from a final order entered by the Circuit Court of Berkeley County on June 11, 1984, which reversed and set aside the Commissioner's administrative decision rendered on December 2, 1982, affirming the business and occupation tax assessment issued against the appellee, H.O. Anderson, Inc., on December 23, 1980, for the period January 1, 1975, through December 31, 1979. For the reasons set forth below, we find that the assessment of business and occupation tax under the facts and circumstances of this case was proper, and we reverse the decision of the circuit court.

**I.**

Anderson is a corporation with offices and storage facilities in Martinsburg, West Virginia. Its principal business is the distribution and sale of petroleum and petroleum related products. During the period in question, Anderson was the exclusive distributor of such products throughout a three county territory in the eastern panhandle of West Virginia for Union Oil of California. Pursuant to a jobber sales agreement with Union, Anderson purchased specified quantities of petroleum products and other merchandise from Union for resale to Anderson's retail customers under Union's brands, trade names, and trademarks.

In the normal transaction, Anderson's transport trucks picked up petroleum products at a terminal facility operated by BP Oil Inc. in Baltimore, Maryland.[1] The products were usually returned to Anderson's storage facility in Martinsburg before resale, but occasionally some products were delivered directly to Anderson's retail customers on the return trip from Baltimore. Pursuant to the jobber sales agreement, title to the products passed to Anderson upon delivery into Anderson's transport equipment at the Baltimore terminal. At that time, Anderson's truck driver received a manifest as evidence of the type and amount of product received, and a copy of the manifest was sent to Union. Union debited Anderson's account after receiving the manifest, and payment to Union for the products was required from Anderson within ten days. Because the trips to Baltimore were made on a daily basis, Anderson usually had an account payable balance owing to Union.

---

1. BP Oil Inc. is not a party to the proceeding now before this Court.

During this same time period, Union contracted with the State of West Virginia to sell petroleum products to various state agencies and institutions. Union, however, did not use its own transport trucks to make deliveries to the state agencies. Instead, Union contracted with Anderson to make the deliveries in the eastern panhandle of West Virginia, because Anderson's smaller transport trucks were capable of reaching locations that could not be serviced by Union's larger trucks.

When a state agency or institution needed petroleum products, a procedure closely paralleling sales under the jobber sales agreement was followed. Either Union or the state agency or institution requesting delivery contacted Anderson, which sent a transport truck to the BP Oil Inc. terminal in Baltimore and took delivery. At that time, BP Oil Inc. prepared a manifest showing the nature and quantity of the products delivered to Anderson. One copy of this manifest was given to Anderson's truck driver, and one copy was sent by BP Oil Inc. to Union. The billing procedure used by Union under the jobber sales agreement was also used in these instances. Union acknowledged Anderson's receipt of the products by debiting Anderson's account and sending an invoice to Anderson.

After receiving the product in Baltimore, Anderson's truck driver normally delivered the product directly to the state agency along with a merchandise transfer invoice stating· the type and quantity of product delivered. This invoice was signed by the employee accepting delivery on behalf of the state agency. The state agency retained a copy of this invoice, and one copy was sent to Union.[2] No payments were made by the State to Anderson. Instead, Union issued a credit memorandum to Anderson after receiving the merchandise transfer invoice. The credit memorandum included a credit to Anderson's account equal to the debit previously charged, a freight commission for picking the product up in Baltimore and transporting it to West Virginia, and a delivery commission for transporting the product to the state agency.[3] Thus, Anderson realized profit to the extent that Union credited Anderson's account for the freight and delivery commissions earned in transporting the products to the state agency.[4]

The question presented is whether the credit by Union of Anderson's account following Anderson's delivery of products to the State resulted in gross receipts to Anderson under West Virginia Code § 11–13–1 (1983 Replacement Vol.).[5] The appellant contends that three separate sales occurred during the transactions involving BP Oil Inc., Union, Anderson, and the State. According to the Commissioner, a sale was made from Union to Anderson when Anderson took possession of the products at the Baltimore terminal and Union debited Anderson's account; a second sale was made from Anderson back to Union when the petroleum products were des-

---

2. Pursuant to its contract with the State, Union determined the price of the product and billed the State directly. The State thereupon paid Union for the product delivered, and Union paid business and occupation taxes on the deliveries to the State.

3. Union mailed Anderson the "credit memorandum" after mailing the billing invoice. Upon receipt, Anderson would attach the "credit memorandum" to the corresponding invoice and send the two back to Union. Anderson sometimes enclosed a check in payment of charges incurred under the jobber sales agreement.

4. In some instances, Anderson delivered products to the state agencies out of its bulk storage facility in Martinsburg instead of travelling to Baltimore. As in the transactions discussed above, Anderson would make delivery and then send proof of delivery to Union. There were also instances when Anderson's transport trucks picked up "split loads" at the Baltimore terminal. In those instances, the petroleum product earmarked for delivery to state agencies was commingled with the product purchased by Anderson for resale to its retail customers.

5. West Virginia Code § 11–13–1 provides, in pertinent part:

"Gross income" means the gross receipts of the taxpayer, other than a banking or financial business, received as compensation for personal services and *the gross receipts of the taxpayer derived from trade, business, commerce or sales and the value proceeding or accruing from the sale of tangible property (real or personal), or service, or both....* (emphasis added).

ignated for delivery to the State; and a third sale was made from Union to the State when the State purchased the products from Union. The Commissioner ruled that the credits to Anderson's account in amounts equal to prior debits constituted taxable gross receipts to Anderson under our business and occupation tax statute.

In reversing and setting aside the appellant's administrative decision, the circuit court rejected the Commissioner's characterization of the facts. The crucial factor in the circuit court's analysis was its conclusion that the transactions in question should be construed so as to prevent the State from taxing one delivery twice. Although the circuit court found that Anderson became the owner of the petroleum products upon taking delivery at the BP Oil Inc. terminal,[6] it nevertheless concluded that there were not three separate sales as the Commissioner ruled. The circuit court instead found that Union sold the products to the State and that Anderson only delivered the products on Union's behalf.

6. The circuit court's Memorandum of Opinion includes the finding that, "It is not disputed that when Union takes delivery of a tanker of gasoline or fuel oil, Union charges Anderson for the load, the load then becomes the property of Anderson and if the load is lost or destroyed en route, it is Anderson's loss." The circuit court further stated that, "No one can deny that when Anderson delivers to the State agencies it is delivering oil that it owns and has under its control and title."

7. The order of the Circuit Court of Berkeley County reversing and setting aside the business and occupation assessment against Anderson was entered on June 11, 1984, at which time the Commissioner's objections and exceptions were noted. On February 14, 1985, the Commissioner presented this Court with a written motion to extend the time to file his petition for appeal beyond the eight-month appeal period established by West Virginia Code § 58-5-4 (Supp. 1986) and Rule 3(a) the Rules of Appellate Procedure West Virginia Supreme Court of Appeals. We granted and certified this motion to the Circuit Court of Berkeley County by order filed on February 28, 1985. Thereafter, on March 22, 1985, the Commissioner filed a petition with this Court praying for an appeal from the judgment of the Circuit Court of Berkeley County. By order entered on October 1, 1985, we granted the appeal prayed for by the Commissioner.

## II.

With regard to the substantive issues presented,[7] Anderson disputes the circuit court's finding that it had title to the products delivered to the State. While acknowledging that it took title to products transferred to it under the jobber sales agreement, the appellee argues that the circuit court erred when it found that the appellee took title to the products under its contract with Union to make deliveries to the State.

Anderson, therefore, disputes the Commissioner's portrayal of the transactions as involving sales from Union to Anderson and "sales back" from Anderson to Union prior to the sales from Union to the State. Instead, Anderson contends that it was not a party to the transactions involving the State in any manner other than as a bailee under Union's control. According to Anderson, the transactions involving the State began with consignment sales from BP Oil Inc. to Union, at which time title became vested in Union, and concluded with sales from Union to the State, at which time title became vested in the State.

Anderson argues in its brief that this Court does not have jurisdiction over an appeal not timely or properly perfected and that the Commissioner's appeal must therefore be dismissed as improvidently awarded. We reject this argument based on Rule 16(b) of the Rules of Appellate Procedure, which provides that "[t]he Court for good cause shown may upon motion enlarge the time prescribed by these rules or by its order for doing any act, or may permit an act to be done after the expiration of such time." W.Va.Sup.Ct.R.App.P. 16(b). We are mindful of our holding in *City of Keystone v. West Virginia Human Rights Comm'n*, 173 W.Va. 172, 313 S.E.2d 449 (1984), that, in the absence of an extension under West Virginia Code § 58-5-4 and Rule 3(a) of the Rules of Appellate Procedure, no appeal can be entertained by this Court. However, the facts presented in the present case are distinguishable from those present in *Keystone*. In *Keystone*, the appellant did not seek an extension from the circuit court under West Virginia Code § 58-5-4 and Rule 3(a), nor was an enlargement of time to appeal sought from this Court under Rule 16(b). In this case, however, the Commissioner sought and was granted an extension of time to appeal under Rule 16(b) of the Rules of Appellate Procedure. Thus, this Court is within its jurisdiction in entertaining the Commissioner's appeal.

Anderson argues that it was only paid a service fee for making deliveries to the State, and that it should be subject to business and occupation tax only on those service related fees. Anderson urges this Court to treat the debits and corresponding credits made to Anderson's account not as evidence of sales to Anderson and "sales back" to Union, but as bookkeeping entries made only for record keeping purposes. Alternatively, Anderson argues even if sales were made from Union to Anderson, we should find that Anderson returned the products to Union and that the corresponding credits to Anderson's account constituted refunds to Anderson under West Virginia Code § 11–13–1.[8] Under this theory, Anderson argues that no gross receipts were realized and that the assessment of business and occupation tax was therefore improper.

 It is well settled in this jurisdiction that the actual rights and duties established by the terms of taxpayers' transactions are controlling for purposes of the business and occupation tax statute. *See, e.g., West Virginia Tractor & Equipment Co. v. Hardesty,* 167 W.Va. 511, 280 S.E.2d 270, 274 (1981); *Frazee Lumber Co. v. Haden,* 156 W.Va. 844, 197 S.E.2d 634 (1973); *State ex rel. Hardesty v. Aracoma-Chief Logan No. 4523, V.F.W.,* 147 W.Va. 645, 129 S.E.2d 921 (1963). In this instance, Anderson and Union structured the transactions involving the State in such a manner that we conclude sales were made from Union to Anderson upon delivery of the products into Anderson's transport trucks at the Baltimore terminal; that sales were made back from Anderson to Union simultaneously with delivery of the products to the State; and that Anderson is subject to assessment of business and occupation tax on the gross receipts realized because of the credits made by Union to Anderson's account. Therefore, we find that the assignments of error made by the Commissioner are supported by the principles under which the business and occupa-

tion tax is applied, and we reverse the judgment of the Circuit Court of Berkeley County.

## III.

 In reaching our decision, we first consider whether delivery of the petroleum products into Anderson's transport trucks constituted sales or bailments of those products. If, as the appellee contends, a bailment relationship existed, the Commissioner's title passing theory would be without merit. We are not persuaded, however, that the transactions were bailments instead of sales. To the contrary, we agree with the Commissioner and the circuit court that title to the products passed from Union to Anderson at the Baltimore terminal.

"The traditional rule for transfer of ownership in chattels states that the type of interest conferred by a transaction is governed by the law of the state where the chattel is located at the time of the transaction." *Rawl's Auto Auction Sales v. Dick Herriman Ford, Inc.,* 690 F.2d 422, 426–27 (4th Cir.1982) (citing *Holt Motors v. Casto,* 136 W.Va. 284, 67 S.E.2d 432 (1951)); *see also* Syl. Pt. 2, *Kurner v. O'Neil,* 39 W.Va. 515, 20 S.E. 589 (1894). The laws of Maryland govern in determining the type of interest conferred to Anderson by Union, because the products were delivered to Anderson in Baltimore.

The Court of Appeals of Maryland has defined a bailment to be:

"The relation created through the transfer of the possession of goods or chattels, by a person called the bailor to a person called the bailee, without a transfer of ownership, for the accomplishment of a certain purpose, whereupon the goods or chattels are to be dealt with according to the instructions of the bailor."

. . . .

To constitute a bailment there must be an existing subject-matter, a contract with reference to it which involves the possession of it by the bailee, delivery,

---

**8.** West Virginia Code § 11–13–1 provides: "The terms 'gross income' and 'gross proceeds of sales' shall not be construed to include ... (2) the proceeds of sale of goods, wares or merchandise returned by customers when the sale price is refunded either in cash or by credit...."

actual or constructive, and acceptance, actual or constructive....

*General Refining Co. v. Int'l Harvester Co.*, 173 Md. 404, 414, 415, 196 A. 131, 135, 136 (1938) (quoting A. Dobie, *Handbook on the Law of Bailments and Carriers* 1 (1914)); *see also Broadview Apartments Co. v. Baughman,* 30 Md.App. 149, 151, 350 A.2d 707, 709 (Md.Ct.Spec.App.1976). A bailment is distinguished from a sale under Maryland law, because "[i]n a sale there is an agreement, express or implied, to pay money or its equivalent for the thing delivered, and there is no obligation to return." *B.F. Sturtevant Co. v. Cumberland Dugan & Co.*, 106 Md. 587, 618, 68 A. 351, 356 (1907).

In determining the actual character of the interest passed to Anderson, we are governed by the intention of the parties, which must be determined from the whole scope and effect of the transactions. *B.F. Sturtevant Co.,* 106 Md. 587, 68 A. 351; *see also* 8 Am.Jur.2d *Bailments* § 33 (1980); 17 Am.Jur.2d *Contracts* § 1 (1964). We believe the record shows the parties intended to create a relationship of seller and buyer.

We find it difficult, as Anderson would have us to do, to separate the overall effect of the transactions involving the State from those under the jobber sales agreement. There is no dispute that the transactions under the jobber sales agreement were sales and that title passed to Anderson upon delivery of the products into Anderson's trucks. In those instances when Anderson received delivery of the products under the jobber sales agreement and stored them in Martinsburg before receiving orders from the State, Anderson does not deny that it took and held title to the petroleum products. The products in storage were not designated for delivery to the State, and Anderson was free to sell those products to any of its retail customers.

The more difficult question is whether title passed to Anderson in those instances when Anderson's drivers delivered the products directly to the State on the return trip from Baltimore. On examination of these transactions, we find that an important element of the jobber sales agreement was involved. Specifically, the record shows Anderson was required to pay Union for products received under the jobber sales agreement within ten days, and Anderson customarily owed Union an accounts payable balance. The same billing procedure was used when Anderson received products for delivery directly to the State. The price of the products received was added to Anderson's account regardless of whether the products were delivered to the State or sold to Anderson's retail customers.

Anderson, nevertheless, argues that it was under Union's control throughout the transactions involving the State, and, therefore, that a bailor and bailee relationship existed instead of a seller and buyer relationship. We find that this argument lacks substance. While it is true that Union controlled the price and quantity of the products delivered to the State, Anderson controlled its own actions. In fact, Anderson had at least three options with respect to the products under its control. Anderson could (1) sell the products to its own retail customers and pay Union the amount charged to its account; (2) deliver the products to the State and receive credits to its account equal to the prior debits; or (3) return the products to Union and receive refunds. These options were available to Anderson because Union actually charged Anderson's account after the products were delivered to Anderson.

These facts, together with the testimony of Anderson's president at the administrative hearing,[9] convince us that the parties

---

9. When questioned by his counsel at the administrative hearing concerning a delivery to Shepherd College, Donald V. Wareing, Anderson's president, responded in part as follows:

> We then retain a copy of this invoice at our office and sent duplicate copies or original copies to Union Oil Company whereupon they

issued us a credit where they buy back the oil from us for the same price that we, that they bill us from the manifest from when my driver loaded in the morning. I'm getting one ahead of the other.

intended the transactions to be sales from Union to Anderson. The charges made to Anderson's account show that the parties structured the transactions as sales, and it is their conduct which controls our determination.[10] We agree with the Commissioner that Anderson has not sufficiently explained why, if the parties only intended to create a bailment relationship, an actual charge was incurred by Anderson. Therefore, we conclude that the true relationship intended by the parties was that of seller and buyer.

### IV.

Next, we consider whether Anderson's deliveries to the State were taxable events under our business and occupation tax statute. For the reasons detailed below, we hold that the assessment against Anderson is proper under the standards governing business and occupation tax assessments.

The West Virginia business and occupation tax is a tax on the privilege of doing business in West Virginia; it is not an income tax. Syl. Pt. 3, *Bethlehem Mines Corp. v. Haden*, 153 W.Va. 721, 172 S.E.2d 126 (1969); *see also* Syl. Pt. 1, *Hydraulics, Inc. v. Dailey*, 171 W.Va. 648, 301 S.E.2d 605 (1983). In order to find that Anderson is subject to the business and occupation tax on the transactions in question, it is necessary to find that Anderson engaged in "business" and made "wholesale sales" to Union, as those terms are defined in West Virginia Code § 11–13–1. The term "business" "include[s] all activities engaged in or caused to be engaged in with the object of gain or economic benefit, either direct or indirect." The terms "sale," "sales" and "selling" include "any transfer of the ownership of or title to property, whether for money or in exchange for other property." The phrases "selling at wholesale" and "wholesale sales" include "[s]ales of any tangible personal property for the purpose

of resale in the form of the tangible personal property...." In this instance, the Commissioner seeks to tax Anderson under West Virginia Code § 11–13–2c (1983 Replacement Vol.), which specifies the rate of tax on the business of selling personal property at wholesale.

The appellee's principal business activity is the distribution and sale of petroleum and petroleum related products to retail customers. During the period in question, the appellee was the exclusive jobber of Union's products in the eastern panhandle of West Virginia. Although the appellee argues that its agreement with Union concerning deliveries to state agencies was intended to be separate from the jobber sales agreement, we find that the two agreements were inextricably linked. The deliveries to the State were important to the maintenance of Anderson's principal business of selling petroleum products as Union's branded jobber. We, therefore, conclude that Anderson's deliveries to the State were "engaged in with the object of gain or economic benefit...." W.Va.Code 11–13–1.

We recently held that "[a] transfer of property which by its own terms does not call for the vesting of ownership or title to the property in the transferee is not a sale for the purposes of the Business and Occupation Tax...." Syl. Pt. 1, *West Virginia Tractor & Equipment Co. v. Hardesty*, 167 W.Va. 511, 280 S.E.2d 270. Conversely, then, a transfer of property which by its own terms calls for the vesting of ownership or title to the property in the transferee is a sale for the purposes of the business and occupation tax. In this case, title to the products passed to Anderson for consideration, the debit to Anderson's account, and title was passed back to Union for consideration, the credit to Anderson's account after the deliveries to the State.

---

The manifest is sent by the terminal to Union Oil Company and Union Oil Company bills us for the product.

**10.** We are aware that an invoice, standing alone, is not evidence of a sale. *B.F. Sturtevant Co.*, 106 Md. 587, 68 A. 351; *see also* 48A C.J.S. *Invoice* at 221 (1981). In this instance, how-

ever, the invoices issued by Union to Anderson did not stand alone. Actual debits were made to Anderson's account under the ten day credit arrangement. Thus, Anderson agreed to pay "money or its equivalent" to Union for the products received by Anderson in Baltimore.

▮ Actual delivery of the products from Anderson to Union prior to delivery to the State is not indispensable to the passing of title back to Union. *See* Syl. Pt. 1, *J.E. Poling v. Huffman & Frost*, 84 W.Va. 199, 99 S.E. 445 (1919). We have recognized, as have other jurisdictions, that delivery may be actual or constructive. "A constructive delivery of goods sold may be substituted for an actual delivery thereof only when such constructive delivery is in pursuance of agreement by the parties or an established custom." Syl. Pt. 1, *Back & Greiwe v. Smith*, 66 W.Va. 47, 66 S.E. 1 (1909). "Constructive delivery is a general term comprehending all those acts which, although not truly conferring a real possession on the vendee, have been held by construction of law equivalent to acts of real delivery." Syl. Pt. 5, *Lakeview Gardens, Inc. v. State ex rel. Schneider*, 221 Kan. 211, 557 P.2d 1286 (1976); *see also* 77 C.J.S. *Sales* § 155 (1952 & Supp 1986); 16D C.J.S. *Constructive* at 708 (1985); 8A Words and Phrases *Constructive Delivery* at 512 (1951 & Supp.1986).

▮ Here, the parties agreed that Anderson would deliver the products to the State on Union's behalf. Whether made from Anderson's storage facility, or direct-ly from Anderson's trucks returning from Baltimore, we hold that Anderson's deliveries to the State were equivalent to actual deliveries to Union. Anderson delivered the quantity requested by the State, and Union billed the State directly in accordance with the terms of the agreement between Union and the State. Based on this finding, we hold that title passed from Anderson to Union simultaneously with the delivery of the products to the State, and that the deliveries to the State were "wholesale sales" of the products from Anderson to Union for the purpose of resale to the State.[11]

We find the provisions of the Uniform Commercial Code (U.C.C.)[12] instructive in determining the passage of title in tax cases or other regulatory situations, and we find the relevant provisions of Article 2 helpful in resolving the question of when title passed in the case before us.[13] While the role of title is diminished under the U.C.C., rules are provided in Article 2, Section 401 for determining when title passes in a context such as taxation.[14] West Virginia Code § 46-2-401(1) provides that title will pass "in any manner and on any conditions explicitly agreed on by the parties"; however, where there is no explicit agree-

---

**11.** We find Anderson's "return" and "refund" theory without merit. This theory claims an exemption from the business and occupation tax under Code § 11-13-1(2). "Where a person claims an exemption from a law imposing a license or tax, such law is strictly construed against the person claiming the exemption." Syl. Pt. 2, *State v. Aracoma-Chief Logan No. 4523, V.F.W.*, 147 W.Va. 645, 129 S.E.2d 921 (1963) (quoting Syl. Pt. 2, *State ex rel. Lambert v. Carman*, 145 W.Va. 635, 116 S.E.2d 265 (1960)). Therefore, we hold that, in order to take advantage of the exemption under Code § 11-13-1(2), there must be an actual return of goods.

**12.** West Virginia has adopted the U.C.C., which is set forth in West Virginia Code §§ 46-1-101 to 46-10-104. The general provisions of the U.C.C. are set forth in Code §§ 46-1-101 to 46-1-208. The provisions concerning sales are found in Code §§ 46-2-101 to 46-2-725.

**13.** In *Ashland Oil, Inc. v. Donahue*, 159 W.Va. 463, 474, 223 S.E.2d 433, 440 (1976), we decided that the sale of petroleum products is a transaction in goods which is governed by the U.C.C. *See* W.Va.Code § 46-2-105(1) (1966).

**14.** Official Comment 1 to West Virginia Code § 46-2-401 provides:

1. This Article deals with the issues between seller and buyer in terms of step by step performance or non-performance under the contract for sale and not in terms of whether or not "title" to the goods has passed. That the rules of this section in no way alter the rights of either the buyer, seller or third parties declared elsewhere in the Article is made clear by the preamble of this section. *This section, however, in no way intends to indicate which line of interpretation should be followed in cases where the applicability of "public" regulation depends upon a "sale" or upon location of "title" without further definition. The basic policy of this Article that known purpose and reason should govern interpretation cannot extend beyond the scope of its own provisions. It is therefore necessary to state what a "sale" is and when title passes under this Article in case the courts deem any public regulation to incorporate the defined term of the "private" law.* (emphasis added).

ment between the parties, West Virginia Code § 46-2-401(2) provides that title will pass "to the buyer at the time and place at which the seller completes his performance with reference to physical delivery of the goods...." In this instance, the parties agreed that Anderson would deliver the products to the State, but the record shows no explicit agreement concerning the passage of title from Anderson to Union. Accordingly, we find that title passed to Union simultaneously with Anderson's delivery of the products to the State, when Anderson's performance was complete.[15]

Based on the foregoing, we hold that the assessment of business and occupation tax was proper under the facts of this case, and we reverse the judgment of the Circuit Court of Berkeley County which reversed and set aside that assessment.[16]

Reversed.

BROTHERTON, Justice dissenting:

I cannot agree with the majority's characterization of an oral contract for the delivery of oil as three separate sales. The majority's conclusion comports with neither the form nor the substance of the underlying transaction. The majority acknowledged that the substance of the arrangement between Union and Anderson was a contract for delivery. With regard to form, there was no agreement between Union and Anderson "which by its own terms [called] for the vesting of ownership or title to the property in the transferee." The case does not, therefore, come within the rule of *West Virginia Tractor & Equip. Co. v. Hardesty*, 167 W.Va. 511, 280 S.E.2d 270 (1981).

Anderson and Union had a written jobber sales contract, but no written agreement governing the deliveries in issue in this case. The majority's rule penalizes Anderson based on bookkeeping entries alone—the debits and offsetting credits recorded upon pick-up and delivery of oil ordered by the State. This goes beyond exaltation of form over substance, to creation of fictional sales never intended by the parties.

Therefore, I respectfully dissent.

---

**15.** Other jurisdictions have also considered the title passing tests of the U.C.C. to determine when, for taxation purposes, title to goods is transferred. *See, e.g. New England Yacht Sales v. Comm'r of Revenue*, 198 Conn. 624, 504 A.2d 506 (1986); *Franklin Fibre-Lamitex Corp. v. Director of Revenue*, 505 A.2d 1296 (Del.Super.Ct.1985) *aff'd, Franklin Fibre-Lamitex Corp. v. Director of Revenue*, 511 A.2d 385 (Del.1986); *Martin v. Melland's Inc.*, 283 N.W.2d 76 (N.D.1979); *Continental Illinois Leasing Corp. v. Dep't of Revenue*, 108 Ill.App.3d 583, 64 Ill.Dec. 189, 439 N.E.2d 118 (1982); *City of Richmond v. Petroleum Marketers, Inc.*, 221 Va. 372, 269 S.E.2d 389 (1980).

**16.** We do not believe the assessment against Anderson constitutes double taxation of the same delivery. We agree with the Commissioner that Union's payment of business and occupation tax on its sales to the State is not relevant to the assessment of business and occupation tax against Anderson on its sales to Union. Assessment of business and occupation tax on taxable events which are independent of one another is not prohibited. Although Anderson's sales to Union were made simultaneously with the deliveries to the State, we hold that Union's sales to the State were, in fact, independent transactions for purposes of the business and occupation tax.